The **HERNANDO BANK, Plaintiff,**

v.

**BRYANT ELECTRIC COMPANY, INC., Defendant.**

**No. DC 70-37-S.**

United States District Court, N. D. Mississippi, Delta Division.

Jan. 24, 1973.

Ross L. Franks, of Walker, Franks, Rone & Bridgforth, Hernando, Miss., for plaintiff.

Pat H. Scanlon, of Young, Young & Scanlon, Jackson, Miss., for defendant.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

A motion for summary judgment, supported by affidavits, was filed in this action by each party prior to August 23, 1972. The court convened on that date to hear the motions at the United States Courthouse, Clarksdale, Mississippi. When the case was called, counsel made known to the court that extensive discovery, by way of depositions, requests for admissions and production of docu-

ments, had been made by both parties and that the affidavits, admissions, depositions and exhibits thereto, on file with the clerk, contained all evidence which the parties would offer at a trial of the case on the merits.

It was, thereupon, agreed by counsel, with consent of the court, that the action would be submitted for decision on the merits, rather than for decision on the motions for summary judgment. Accordingly, after extended argument by counsel, the action was submitted to the court on the record in the case. The record consisted principally of affidavits, depositions and exhibits thereto, and admissions by the parties.

The court has experienced considerable difficulty in eliminating the mass of incompetent, immaterial, hearsay and conclusionary evidence contained in the depositions and affidavits filed with the clerk and made a part of the record in this action. The court has endeavored to eliminate from its consideration evidence of this character and to arrive at findings of fact and conclusions of law based upon proper, competent and material evidence.

This memorandum of decision contains the court's findings of fact and conclusions of law, as required by Rule 52(a), F.R.Civ.P.

## THE BACKGROUND

The defendant, Bryant Electric Company, Inc. (Bryant) is a North Carolina corporation, organized and incorporated in 1931. The company was founded in 1924 by Hobart Bryant and his brother, Bill Bryant. The Bryant brothers operated the business as a partnership until 1929, when Hobart Bryant bought the interest of his brother. The business was incorporated two years later. The company was engaged principally in the operation of a motor repair shop, and in the wiring and rewiring of industrial plants in the area served by the company.

H. R. Pancoast (Pancoast) came with Bryant in 1938. Before World War II the company expanded its operations into rural electrification and institutional work. During World War II Bryant engaged in a joint venture with a New York electrical firm on the atomic energy plant at Oak Ridge, Tennessee. This contact gave Bryant stature and prestige, and provided the opportunity for a large expansion of the business. Hobart Bryant retired in 1951, and Pancoast acquired the controlling interest in the corporation. Pancoast became president of Bryant and held this position until his retirement on September 30, 1969. Pancoast served as president, and was a member of the Board of Directors of Bryant during the period pertinent to the action sub judice. He was also a stockholder during this period.

For the past thirty years, more or less, Bryant has been interested, by way of stock ownership, in numerous other corporations. Each such corporation was and is a separate and distinct entity, but is known as an affiliate of Bryant. Bryant acquired in 1961 a 23.8% interest in Bryant-Durham Electric Co., Inc. and a 25% interest in Beco, Inc. In 1966 Bryant acquired a 15.1% interest in Bryant-Greenville Electric Co., Inc. (Bryant-Greenville) and in 1967 a 24.8% interest in Bryant Utilities Construction Co., Inc. (Bryant Utilities).

Charles L. Tucker (Tucker) is President of Bryant and has served in this capacity since October 1, 1969. For the period 1966 to 1967 Tucker served as Executive Vice-President of Bryant. During this period of time Tucker was and is presently a stockholder in Bryant and a member of its Board of Directors.

Mrs. Kay D. Wall (Mrs. Wall) is Secretary-Treasurer of Bryant. She has been Treasurer since 1967, and Secretary since 1969. Mrs. Wall is a member of the Board of Directors and a stockholder of Bryant. She is an official of one or more of Bryant's affiliates, including Bryant Utilities and Bryant-Greenville. Bryant performs bookkeeping services for its affiliates, for which

a fee is charged. Mrs. Wall is in charge of the bookkeeping department.

Morris Cockman (Cockman) is employed at the present by Bryant and is stationed in Orlando, Florida. In 1966 Cockman became associated with Bryant Utilities. Prior to that time he had been employed by Bryant as an electrician. When Bryant Utilities was organized in 1966 Cockman acquired a 25% interest in the corporation. Bryant held a 25% interest and the balance was held by Pancoast, Tucker and others. Cockman became Executive Vice-President and later President of the company. He held this connection from the time he acquired his interest in the company until 1971. He was not, at any time, a stockholder, director or official of Bryant.

James C. Ford (Ford), an engineer by profession, came to Bryant Utilities on or about July 1, 1967 from Daniels Construction Company. He has not been an officer, director or stockholder in Bryant or Bryant Utilities.

As will appear in the following portion of this memorandum, it is helpful to know and understand the connection, if any, which Pancoast, Tucker, Mrs. Wall, Cockman and Ford had with Bryant during the time pertinent to the action sub judice.

August R. Marcinkowska (Marcinkowska) has been a resident of DeSoto County, Mississippi for twelve or thirteen years. In 1959 or 1960 Marcinkowska purchased a business in DeSoto County known as Beauty Lawn Sprinkler Company. This business was engaged in the installation of sprinkler systems for lawns, golf courses, etc. After its acquisition, Marcinkowska and his wife operated the business under the same name until March 31, 1967 when the business was incorporated as "Beauty Lawn Sprinkler Company, Inc." (Beauty Lawn). The incorporators were Marcinkowska, W. E. Wilroy, Jr., his attorney, and Minor Smith, an office employee. After the issuance of the charter by the State of Mississippi, the business continued under the corporate name, Beauty Lawn Sprinkler Company, Inc., until September 18, 1967 when its name was changed by charter amendment to Uticon Company, Inc. (Uticon).

From the beginning, Marcinkowska made use of the banking services of plaintiff, The Hernando Bank (Bank). From time to time Marcinkowska borrowed money from the Bank and his account was serviced by J. O. Thompson (Thompson), one of the Bank's Vice-Presidents. The Bank's liability ledger sheet for Marcinkowska's loan account reflects that an original loan for $900 was made March 15, 1960. From that time until March 2, 1966 the account fluctuated, at one time reaching a high of $33,000. On March 2, 1966 the Bank made a loan to Marcinkowska, d/b/a Beauty Lawn Sprinkler Co., for the sum of $45,000. The Small Business Administration (SBA) held a 70% participation in this loan. It was secured by a real estate and chattel deed of trust. On March 31, 1967, the date of the incorporation of Beauty Lawn, Marcinkowska owed the Bank $81,395.26.

Marcinkowska knew Carl Hyatt (Hyatt). Hyatt and another were engaged in the business of digging trenches or ditches under the firm name of H & G Construction Company (H & G). H & G became indebted to Bryant for several thousand dollars, as the result of a subcontract which H & G had with Bryant. Hyatt was anxious to secure trenching jobs so that he might pay the obligations of the company. At this time a number of rural water systems were being installed in Mississippi through the assistance of the Farmers Home Administration (FHA). This field of activity was attractive to both Marcinkowska and Hyatt. In the first part of 1966 Bryant Utilities was engaged on a subcontract with Bryant on a project at the Meridian Naval Air Station, Meridian, Mississippi. Cockman was stationed at Meridian in charge of the work. Marcinkowska and Hyatt contacted Cockman and discussed the possibility of Bryant assisting them in

obtaining contracts for the installation of rural water distribution systems in Mississippi. The projects under discussion involved large amounts of money and Marcinkowska could not secure performance and payment bonds for the work. Marcinkowska held a Certificate of Responsibility issued by the Mississippi State Board of Public Contracts which qualified him to bid for public work in Mississippi. Bryant did not hold such a certificate, nor did H & G. The plan proposed was that Bryant would secure a surety to make the performance and payment bonds and Marcinkowska would perform the contract, subcontracting the digging of ditches or trenches to H & G.

As a result of this contact with Cockman, Bryant became interested in a number of water system installation projects in Mississippi. Bryant entered into joint venture agreements with Marcinkowska for the performance of the work. One of these agreements concerned the installation of a water distribution system for the Eudora Water Association. Others involved were systems for the Cameron Water Association and Flower Ridge Water Association. The three projects were the subject of a joint venture agreement entered into December 14, 1966 between Marcinkowska, d/b/a Beauty Lawn Sprinkler Co. and Bryant.

Subsequent to the execution of the joint venture agreement for the performance of the work on the Cameron, Flower Ridge and Eudora systems, Marcinkowska incorporated his business as stated above. The corporation did not, however, change Marcinkowska's method of doing business. In performing the work under the agreement, Bryant issued to Beauty Lawn purchase orders to perform the labor involved in the contract. Beauty Lawn continued to have financial difficulties and Marcinkowska, in violation of his agreement not to do so, assigned one or more of the purchase orders to the Bank as security for money advanced by the Bank to Beauty Lawn.

The deteriorating financial condition of Beauty Lawn forced Bryant to advance funds with which to complete the work covered by the agreement, as well as other work being done by Beauty Lawn at the time. Tucker, Vice-President of Bryant, came to Mississippi in the first part of July, 1967 to discuss the problem with Marcinkowska. A meeting was held at the Beef & Liberty Restaurant near Southaven, Mississippi, and those in attendance were Tucker, representing Bryant; Cockman, Executive Vice-President of Bryant Utilities; Thompson, representing the Bank; Marcinkowska, representing Beauty Lawn; and W. E. Wilroy, Jr., attorney for Beauty Lawn and the Bank. The financial condition of Beauty Lawn was the main topic of conversation at the meeting. In the conference, Beauty Lawn agreed to take certain actions to improve its position.

Upon his return to High Point, Tucker as Vice-President of Bryant, wrote Thompson a letter in which he reviewed and confirmed the understanding reached by the parties at the meeting. Essentially, Tucker wrote Thompson that Bryant would revise the joint venture agreement which it had with Beauty Lawn so as to make Beauty Lawn, in effect, a subcontractor of Bryant; and that Bryant would pay direct for all material, labor, gas, oil and other miscellaneous expense items, up to a budget limit to be agreed upon with Beauty Lawn. Tucker noted that these conditions would continue for a thirty day period, at which time the problem would be discussed anew. Tucker emphatically informed Thompson that Bryant was "not assuming any responsibility for any indebtedness of Beauty Lawn", and requested the Bank not to make loans to Beauty Lawn without the approval and/or knowledge of Bryant. Tucker also requested that the Bank not accept assignments against the above mentioned projects or any other work which Bryant might handle with Beauty Lawn in the future without Bryant's knowledge and consent.

Beauty Lawn's financial condition did not improve. The matter was considered by Bryant's Board of Directors on August 16, 1967. Prior to the meeting, several conferences were held between Tucker and Marcinkowska in an effort to work out a plan by which the problems of Beauty Lawn could be solved. By this time Bryant had advanced considerable money on the projects in which Bryant and Uticon were joint venturers. Additionally, Bryant had become jointly liable with Uticon for any and all expenses related to the joint ventures, and was legally obligated under the performance bond to complete the joint venture contracts. Two alternatives were discussed. Beauty Lawn could take bankruptcy. Such a step meant that Bryant would be required to take over all bonded jobs. In the alternative, Bryant could request and prevail upon the present owners of the issued and outstanding stock in Beauty Lawn to make available to Bryant, Cockman and Ford a sixty percent interest in the company. The latter alternative would permit the use of the present crews and equipment of Beauty Lawn in the completion of the work in progress, and would relieve Bryant from the necessity of completing the jobs for Beauty Lawn.

After discussing the matter, the Board adopted a resolution which provided that Bryant would acquire a 25% interest in Beauty Lawn, and provide an advance of $50,000 to Beauty Lawn for a six month period, provided: 1) Bryant's interest would be acquired at no cost to Bryant; 2) Cockman and Ford together would acquire at least a 35% interest in the company; 3) Cockman and Tucker would become two of the three directors of Beauty Lawn; 4) Ford would become executive vice-president and general manager of Beauty Lawn with sole authority to obligate Beauty Lawn for loans and major purchases and would exercise full general management authority over all activities of Beauty Lawn; 5) Mrs. Wall would become treasurer and handle all financial records; 6) Pancoast would become secretary and maintain all corporate records; and 7) all advances from Bryant to Beauty Lawn would be requested in writing by Ford and approved by Pancoast and/or Tucker.

The corporate minute book of Beauty Lawn contains the minutes of a joint meeting of the board of directors and all stockholders of Beauty Lawn held at the Bank of Hernando, Hernando, Mississippi, on August 21, 1967. The minutes recite that all directors and stockholders were present. The minutes are signed by Marcinkowska as President and Minor F. Smith as Secretary of Beauty Lawn. There is attached to the minutes an agreement signed by all directors and stockholders of Beauty Lawn which waives notice of the meeting and approves the action taken there.

The plan, as proposed by Bryant, was essentially approved by Beauty Lawn at the meeting aforesaid. Ford attended the meeting as an invited guest and as representative of Bryant and Bryant Utilities. The board and stockholders authorized the issuance of shares of stock as follows: Marcinkowska, five shares; Smith, two shares; Cockman, four shares; Ford, four shares; and Bryant, five shares. The minutes provide that the stock issued to Marcinkowska and Smith would be treated as fully paid in exchange for prior contributions made by them to the corporation and that the stock for Cockman, Ford and Bryant should be issued at the par value of $10.00 per share.[1] Marcinkow-

---

1. The pertinent part of these minutes provides:

"The president [Marcinkowska] further brought out the fact that when the corporation was organized stock had never actually been issued, although the president, Mr. August R. Marcinkowska, had contributed all of the assets of Beauty Lawn Sprinkler Company, Inc. which he had operated as a sole proprietorship, the value of said assets at that time exceeding $1,000. Since this time the value of these assets has depleted, and the president of the corporation suggested that stock now be issued in small lots

ska, Tucker and Cockman were elected directors; Marcinkowska was elected President; Ford, Vice-President; Mrs. Wall, Treasurer; and Pancoast, Secretary. There will be a further reference to these minutes, and the action taken at the meeting in a later part of this memorandum.

Beauty Lawn's stockholders approved the change in name of the corporation to "Uticon Company, Inc." at a special stockholder's meeting held on September 1, 1967. This was accomplished by an amendment to the charter, approved by the state on September 18, 1967.

The Bank instituted suit in the Circuit Court of Tate County, Mississippi on April 20, 1970 against Uticon to recover judgment on a promissory note dated September 20, 1969 payable on or before October 20, 1969, signed by Uticon through Cockman, its President, and payable to the Bank in the sum of $75,000.00. Default judgment was entered nine days later, April 28, 1969, in the sum of $85,947.09. This sum included principal, attorney's fees, interest and costs.

The Bank filed the action sub judice on June 30, 1970, seeking to hold Bryant liable for the debt of Uticon which formed the basis of the judgment obtained against Uticon in the state court. Thereafter, the court granted leave to plaintiff to file an amended complaint. This was accomplished on April 3, 1972. The amended complaint contains 108 separately numbered paragraphs, and seeks to recover judgment against Bryant for the sum of $75,000, plus 8% interest from and after October 29, 1969 and 10% attorney fees. Plaintiff demands judgment also for $50,000 additional costs and expenses, and punitive damages in the sum of $100,000.

Bryant did not sign or endorse the note upon which the Bank obtained its judgment against Uticon. The Bank does not contend that Bryant is liable because Bryant signed or endorsed the note in question, or any previous note of which the note constituted a renewal, but advanced several other theories upon which it seeks to hold Bryant responsible. These theories, as set forth in the amended complaint, are: Count I—Joint Venture; Count II—Subscription of Stock; Count III—Conversion; Count IV—Guaranty of Loan; Count V—Fraud; Count VI—Fraudulent Assignment; and Count VII—Disregarding the Corporate Entity. The court will dispose of each theory in the order named.

## JOINT VENTURE

The controversy concerning joint venture centers on two water system installation projects. They are: 1) the Southcentral Water Association project (Southcentral) and 2) the Smith Crossing Water Association project (Smith Crossing). Bryant advanced the funds to perform the Smith Crossing job because Bryant was a joint venturer in the

of shares to the various persons involved in the corporation in accordance with their interests and abilities. Upon motion duly made and seconded, and unanimously passed by all of those present, the following shares of the corporation were authorized to be issued to the following persons:

| | % | Shares | | |
|---|---|---|---|---|
| August R. Marcin-kowska | 25 | 5 | | |
| Minor F. Smith | 10 | 2 | JCF | |
| M. E. Cockman | 20 | 4 | 8/21/67 | |
| James C. Ford | 20 | 4 | | |
| Bryant Electric Company, Inc. | 25 | 5 | | |
| | 100 | 20 | Total | |

In regard to consideration for the shares, motion was made, seconded, and unanimously passed, that the stock issued to Mr. Marcinkowska and Mr. Smith should be determined fully paid in exchange for prior contributions by these gentlemen to the corporation. In regard to the stock issued Mr. Cockman, Mr. Ford, and Bryant Electric Company, Inc., shares will be paid for by these individuals at the rate of $10.00 per share, being the par value as set up in the Articles of Incorporation."

project. The Bank contends that the money advanced to Uticon on the note in question was used to complete the Southcentral project; that the Southcentral project was handled by Uticon and Bryant in the same manner as the Smith Crossing project; that the Southcentral project was a joint venture between Uticon and Bryant; and that Bryant is liable as a joint venturer for the obligation.

The contract for the Southcentral project is dated February 21, 1968 and is signed only by Southcentral and Uticon. The contract is not signed by Bryant. Ford, as Executive Vice-President, and Pancoast, as Secretary, attesting Ford's signature, executed the contract on behalf of Uticon. The performance and payment bonds for the project were made by The American Insurance Company (American), as surety.

The contract for the Smith Crossing project was made April 23, 1968 and was signed by Uticon and Marcinkowska, d/b/a Beauty Lawn, as joint venturers. Marcinkowska entered into the contract because he held the Certificate of Responsibility from the Mississippi Board of Public Contracts which enabled Uticon to bid on the work. Bryant, at the request of Smith Crossing, guaranteed the faithful performance of the contract and became a party venturer therein through an addendum to the contract. Smith Crossing required this to be done before it would award the contract to Uticon. The bonds for this project were also made by American.

As has been indicated, Uticon could not, on its own, secure the issuance of payment and performance bonds. To induce American to make performance and payment bonds for Uticon on the water system installation projects, Uticon, Bryant, Bryant-Greenville and Bryant Utilities, the latter two being affiliates of Bryant, entered into a General Indemnity Agreement with American. The effect of the agreement was to indemnify American from any loss it might sustain because of becoming the surety for Uticon on performance and payment bonds executed by Uticon in connection with the type of contracts just mentioned.

When Bryant became a stockholder in Uticon the bookkeeping work of Uticon was transferred to Bryant's office in High Point, where Pancoast, the Secretary, and Mrs. Wall, the Treasurer, were situated. Bryant provided bookkeeping services for all of its affiliates and undertook to perform such a service for Uticon. Modern and up-to-date bookkeeping machines and procedures were available at Bryant's office. A charge was made by Bryant for this service. It was contemplated when Bryant became a stockholder in Uticon that this service would be available to Uticon. The documents of original entry originated in Uticon's Mississippi office, and were transmitted to Bryant's office for posting. Separate accounts were maintained in Uticon's records by Mrs. Wall for the Southcentral and Smith Crossing projects but the funds were deposited in one bank account. The records, however, reflected the interest of each in the common fund.

Uticon's office was maintained in a trailer in DeSoto County, Mississippi until June, 1969, when the trailer was moved to High Point. At that time, Uticon opened an office in Jackson, Mississippi, where the office was nearer Uticon's Mississippi projects which had not been completed.

Uticon notified American by letter, that it could not complete the projects which it had at the time, nor pay its bills, and requested financial assistance. This occurred on Oct. 21, 1968.

American notified Bryant, and the other corporations who had executed the indemnity agreement above mentioned, that Uticon had made default on the bonded projects and called upon them to save it harmless from any loss pursuant to the provisions of said agreement. American expressed the view that the most economical manner in which to complete Uticon's projects would be to

honor the request for financial assistance, and keep Uticon's personnel and machinery on the job. As a result, American, supported by an indemnity agreement from Bryant, Bryant-Greenville and Bryant Utilities, arranged a loan for Uticon from the Wachovia Bank & Trust Company, High Point, North Carolina, in the sum of $400,000.

In consideration of American's assistance, on November 9, 1968, Uticon, as the contractor, entered into a trust agreement with American, as the surety, Bryant, Bryant-Greenville and Bryant Utilities, as the indemnitors, and Pancoast, as the trustee, whereby Uticon agreed to establish a trust account entitled "Uticon Company, Inc., Special Account", into which would be deposited the proceeds of the loan, as well as all monies received by Uticon on bonded projects. The trust agreement provided that the trustee pay from this special account the cost of the completion of all bonded jobs, including Uticon's general overhead expenses, taxes, insurance, and repayment of principal and interest on loans.

The parties agree that the Smith Crossing project was a joint venture. The record reflects, however, that the Smith Crossing project was undertaken by Uticon and that the performance of the contract for the work was guaranteed by Bryant, who became a party to the contract.

The Southcentral project was different. Bryant did not agree to participate with Uticon in a joint venture in the Southcentral project. Neither did Bryant guarantee the faithful performance of the contract. The evidence does not disclose that Bryant and Uticon agreed to share profits from the contract. Bryant was interested from a profit standpoint only as a stockholder in Uticon. Bryant, however, had a real interest in the faithful performance of the contract by Uticon. This is true because of the outstanding indemnity agreement held by Uticon's surety, to which Bryant was a party.

■■ The fact that Bryant did not enter into a formal agreement with Uticon for the Southcentral project is not, in and of itself, decisive of the issue. A joint venture need not be expressed or embodied in a formal agreement but may be inferred from the conduct of the parties and the facts and circumstances. Boxwell v. Champagne, 229 Miss. 355, 91 So.2d 256, 261 (Miss.1956); Sample v. Romine, 193 Miss. 706, 8 So.2d 257, 261 (1942). Such an agreement, expressed or implied, is necessary, and an essential provision is that the parties share the profits of the undertaking. Sample v. Romine, *supra*, at 261.

■ The court has carefully read and studied the entire record, consisting of the pleadings, affidavits, admissions and depositions filed. The court cannot find from the conduct of the parties and the facts and circumstances that Uticon and Bryant entered into an agreement, express or implied, to share the profits of the Southcentral contract or to have a joint proprietary interest therein.

The court finds that plaintiff has not shown by a preponderance of the evidence that a joint venture existed between Uticon and Bryant with reference to the Southcentral project or that Bryant is liable for Uticon's debts, contracted in performing the contract.

■ Assuming, arguendo, that a joint venture existed between Uticon and Bryant on the Southcentral project, the Bank cannot recover for still another reason. The Bank has not shown by a preponderance of the evidence that it advanced any new money on the note forming the basis of this action. The Bank's records reflect that on June 7, 1968 the Bank advanced Uticon by way of loan the sum of $74,000. For the most part, the note forming the basis of this action is a renewal of the debt created by the advance made at that time.

The court finds that the evidence does not sustain the Bank's cause of action against defendant on the joint venture theory.

## SUBSCRIPTION OF STOCK

Uticon's authorized capital is $250,000, consisting of 25,000 shares of common stock of the par value of $10.00 per share.

It is not clear from the record whether any stock was actually issued upon the incorporation of Beauty Lawn. It is clear, however, that after the incorporation the business was operated in the same manner as Marcinkowska had operated it before the incorporation. At any rate, such stock, if any, was later returned by Marcinkowska and surrendered to the corporation for cancellation. This feature of the case is, however, immaterial to the court's decision.

Plaintiff's cause of action against Bryant on the stock subscription issue is based upon the third draft of the minutes of the August 21, 1967 meeting of the board of directors and stockholders of Beauty Lawn which were prepared by Wilroy, attorney for Beauty Lawn, at the request of Ford, whom plaintiff contends represented Bryant in the matter.

In the last revision of the minutes, which were signed by Marcinkowska, as President, and Minor F. Smith, as Secretary, of Beauty Lawn, and adopted by Marcinkowska, Smith and Wilroy, as Directors of Beauty Lawn, a change was made in the portion of the minutes which is pertinent to this action. This portion was rewritten to read as follows:

"Upon motion duly made and seconded, and unanimously passed by all those present, the following shares of the corporation were authorized to be issued to the following persons:

| Name | Shares |
|------|--------|
| Helen E. Marcinkowska | 5000 |
| Minor F. Smith | 2000 |
| M. E. Cockman | 4000 |
| James C. Ford | 4000 |
| Bryant Electric Company, Inc. | |

That of these shares the following will be issued immediately, Helen E. Marcinkowska 5 shares; Minor F. Smith 2 shares; M. E. Cockman, 4 shares; James C. Ford, 4 shares; Bryant Electric Company, Inc., 5 shares. The remaining authorized shares shall be issued on October 1, 1967 or sooner upon tender of payment at par value by those persons authorized to receive same. In regard to consideration for the shares, motion was made, seconded, and unanimously passed, that the stock issued to Mrs. Marcinkowska and Mr. Smith should be determined fully paid in exchange for prior contributions by these persons to the corporation. In regard to the stock issued Mr. Cockman, Mr. Ford, and Bryant Electric Company, Inc., shares will be paid for by these individuals at the rate of $10.00 per share, being the par value as set up in the Articles of Incorporation.

The court finds that the Bank has not proved by a preponderance of the evidence that Bryant agreed to purchase 5,000 shares of Uticon's stock at the par value of $10 per share, or that Bryant obligated itself to pay $50,000 for such stock. The evidence reflects that at a later time Bryant purchased 500 shares of stock and paid Uticon for the same in the sum of $5,000. Plaintiff's demand on this theory of the case is for the sum of $45,000, representing the balance due on a stock subscription by Bryant.

There are several reasons which support the court's determination of this issue.

The minutes upon which the Bank bottoms this demand are not official minutes of the corporation. The official minutes are incorporated in the official minute book. The official minutes were prepared prior to the meeting and submitted to Uticon's board and stockholders for adoption. The minutes were typewritten, and complete in every respect when submitted except for the number of shares to be issued each stockholder. The minutes as originally drafted contained a blank space opposite the name of each shareholder, for use in

inserting the number of shares to be issued each stockholder. The minutes as now of record in the minute book reflect that figures were inserted into the blank spaces by Ford, who initialed and dated the entries. This date is the same as the meeting date.

After the minutes were delivered to Pancoast, the incoming secretary of the corporation, Pancoast inserted in his own handwriting the percentages which now appear on the minutes. These entries by Pancoast did not add to or detract from the action taken by the corporation as reflected by the minutes. The matter is not material to a decision of the issue at hand.

The minutes are dated August 21, 1967 and were signed by Marcinkowska, President, and Smith, Secretary, of the corporation. On the same date a document containing a waiver of notice and an approval of the minutes was signed by all stockholders. The signatures of Marcinkowska, Smith, Wilroy and Mrs. Marcinkowska were notarized by a notary public on the day the minutes bear date, and the signature of Robert P. Marcinkowska, another stockholder, was notarized two days later.

■ At the above mentioned meeting, new officers and directors were elected. When the meeting adjourned the newly elected officers were the legal representatives of the corporation. The officers and directors who were replaced were not authorized to act for the corporation after the meeting adjourned. The third draft of the minutes, upon which the Bank relies, does not represent an authorized act of the corporation, and is not valid or binding on any person.

■ There are, however, other grounds upon which the court is justified in holding that the Bank cannot recover on this issue. The minutes upon which the Bank relies, assuming, arguendo, that they are valid and binding minutes, cannot be construed so as to represent a valid subscription on the part of Bryant to purchase the stock in question. The resolution merely authorizes the issuance of the stock upon payment of par value by those who are authorized to receive the stock. The resolution does not contain a commitment on the part of Bryant or any other stockholder to take the stock and pay par value for the same. The minutes are not signed by anyone said to represent Bryant, and the record does not sustain the assertion that Ford was authorized by Bryant to subscribe for the stock on the basis named.

There are still other reasons which reinforce the court's decision on this issue. It is not logical or reasonable that Bryant would agree to pay $50,000 for 5,000 shares, or that Ford and Cockman would each agree to pay $40,000 for 4,000 shares, as the resolution provides, when Mrs. Marcinkowska would receive 5,000 shares worth $50,000 and Minor F. Smith 2,000 shares worth $20,000, without paying anything therefor, receiving the stock cost free because of prior contributions to the corporation. Such a situation would be wholly inequitable as well as being of questionable legality.

■ One other reason for the court's holding on this issue is that the Bank, as a creditor acting for its sole benefit, is not entitled to maintain an action against Bryant, as a defaulting stockholder of Uticon, for the unpaid subscription price. Such an action would, in the judgment of the court, lie only in favor of the corporation, or some authorized representative of the corporation for the benefit of all creditors.

The court finds that the Bank is not entitled to recover on this theory of the case.

## CONVERSION

The Bank's conversion theory is based upon the assertion that Contractor's Estimate No. 13 on the Southcentral project had been paid to Uticon before the Bank accepted an assignment of the estimate as security for its note; that Bryant was aware of this fact, collected the proceeds of the estimate and applied them to its own use and benefit. The

Bank claims a lien on all payments made by Southcentral on the contract after May 22, 1969. The payments are said to aggregate the sum of $97,105.68.

The evidence does not reflect that the Bank relied on the assignment to make a loan to Uticon. The May 22, 1969 note, of which the assignment was a part, for all practical purposes, was a renewal of the debt incurred by Uticon in June 1968.

■ Neither does the evidence show that Bryant collected the payments on the contract or applied them to its own use. The payments were collected by Uticon, deposited in its special account and disbursed by Pancoast, as Trustee, toward the cost of completing the contract. Since the contract payments were not collected by Bryant or converted to the use of Bryant, there can be no recovery for conversion of the funds.

## GUARANTY OF LOAN

At the meeting in July, 1967 at the Beef & Liberty Restaurant, Tucker, Bryant's Vice-President, informed Thompson that Bryant would not assume any responsibility for any indebtedness of Beauty Lawn, but was anxious for Beauty Lawn to place its affairs in order. This position by Bryant was later confirmed by Tucker in a letter to Thompson dated July 14, 1967. Shortly thereafter, as an accommodation to Beauty Lawn, Bryant agreed to guaran-

tee Beauty Lawn's loan from the Bank for the sum of $31,000.00. The note evidencing the loan is known as the "Equipment Note". The purpose of the loan was to provide funds with which Beauty Lawn might consolidate outstanding and past due equipment payments. The guarantee was made in the form of a letter from Bryant to the Bank.[2]

The Bank's records reflect that the Bank does not hold any other written guaranty from Bryant, unless Tucker's letter to the Bank of May 22, 1969 can be considered as a guaranty of the note in question.

The evidence reflects that on May 22, 1969 Cockman, President of Uticon, delivered to the Bank Uticon's note of that date for $75,000 due August 22, 1969, being the note involved in this action. At the same time Cockman delivered to the Bank Uticon's check for the sum of $75,000 drawn on the special account and a check for the interest on the note drawn on the same account. Uticon's note for the same amount dated February 24, 1969 was thereupon marked paid by the Bank, and the Bank issued to Uticon its Memphis exchange for $75,000.

During the transaction Thompson requested Cockman to secure Bryant's financial statement for his file. Cockman communicated this request to Tucker, who, on that date, wrote Thompson, re-

2. The letter is as follows:
"September 21, 1967
The Hernando Bank
Hernando, Mississippi
Gentlemen:
We are writing you with reference to the note given you by Uticon Company, Inc. in the total amount of $31,000. It is our understanding that this note is supported, in part at least, by a trust deed for certain equipment. We do hereby guarantee the remainder of the principal amount of the note over and above the value of said equipment. This guarantee is made with the provision that the equipment referred to herein shall not be sold, transferred, or hypothecated in any manner whatsoever without our prior written approval.
Very truly yours,
BRYANT ELECTRIC COMPANY, INC.
/s/ P
H. R. Pancoast
President
HRP/nht
cc: C. L. Tucker
J. C. Ford
K. D. Wall"

ferring to the request and inclosed a copy of Bryant's financial statement.[3]

The Bank contends that this letter contains a written guaranty of the note involved in the action sub judice. At the time this letter was written, some of the payments on the equipment note were in default and there had been correspondence between the Bank and Bryant in regard thereto.

The statement in the letter that Bryant would "do everything possible to see that this is settled as per agreement", does not, in the opinion of the court, constitute an undertaking by Bryant to pay the note. The only agreement which Bryant had with the Bank, at the time, was the one with regard to the equipment note. Evidently, the Bank did not consider the statement as a guarantee to pay the note for the Bank did not, at any time prior to the filing of the amended complaint in this action, assert that position.

The problem of determining whether a given writing should be construed as a contract of guaranty—or whether some different legal significance should be given to that writing—is a problem that is no different from that which is involved in the construction of contracts generally. Of primary importance is whether the language chosen by the parties indicates an intention to answer for the principal debt or obligation of another person. If it does, the writing should be construed as a contract of guaranty. 38 Am.Jur.2d, Guaranty, § 5 at 1000.

There must be a mutual understanding to constitute a guaranty. It has been held that "courts generally attempt to determine whether the words used—against the background of the circumstances which surrounded the use of those words—would cause the creditor reasonably to believe that the promisor had agreed to answer for a principal obligation on the part of another person." *Id.* at 1001.

After careful consideration of the evidence, the court is of the opinion and so finds that plaintiff has failed to establish by a preponderance of the evidence that the letter of May 22, 1969 contains a contract of guaranty on the part of Bryant.

### FRAUD

The argument of the Bank on the fraud theory centers around the assignment to the Bank of Contractor's Estimate No. 13 on the Southcentral project. This estimate was paid to Uticon on May 19, 1969, three days prior to the assignment. The Bank seeks to charge Bryant with fraud in connection with this transaction. It is not shown by the evidence that Pancoast or Tucker knew that the assignment was being made by Cockman. Cockman, at the time of the execution of the note, was Uticon's President, and was not an officer, director, employee or stockholder of Bryant.

The evidence reflects that the Bank did not advance any funds to Uticon because or on account of the assignment. The elements necessary to establish fraud, as described in Gardner v. State, 235 Miss. 119, 108 So.2d 592 (1959), Anderson Dunham, Inc. v. Aik-

3. The text of the letter is as follows:
"May 22, 1969
Mr. J. O. Thompson
Executive Vice President
The Hernando Bank
Hernando, Mississippi
Dear Mr. Thompson:
In accordance with your request to Mr. Morris E. Cockman, we enclose herewith a combined Balance Sheet of Bryant Electric Co., Inc., BECO, Inc., and T. D. Packs, Inc., which are wholly owned subsidiaries of Bryant Electric Company, Inc. as of March 30, 1969. It is our intention to have a certified audit as of June 30, 1969, and we will be glad to forward you another statement at that time.
We certainly appreciate the help you have given us with Uticon Company, and will do everything possible to see that this is settled as per agreement.
Very truly yours,
BRYANT ELECTRIC COMPANY, INC.
/s/ C. L. Tucker
C. L. Tucker
Executive Vice President"

en, 241 Miss. 756, 133 So.2d 527 (1961) and McMahon v. McMahon, 247 Miss. 822, 157 So.2d 494 (1963), are not shown by the clear and convincing evidence required by law to exist in the case sub judice.

The court is of the opinion and so finds that the Bank is not entitled to recover any sum whatever from Bryant on the basis of fraud.

## FRAUDULENT CONVEYANCE AND ASSIGNMENT

This controversy relates to the special account established by Uticon pursuant to the trust agreement of November 9, 1968, hereinbefore mentioned.

Uticon, Bryant, Bryant-Greenville, and Bryant Utilities entered into a general indemnity agreement with American on October 27, 1967 to induce American to make payment and performance bonds for each of them. The indemnitors assigned, transferred, pledged and conveyed to American, as collateral "any and all sums due or which may thereafter become due under such contracts and all sums due or to become due on all other contracts, bonded of unbonded, in which any or all of the Indemnitors have an interest." Paragraph 7 of the agreement provides that if assignments of the contract proceeds should be prohibited by law or the terms of the contract, the indemnitors would "hold all money or other proceeds of the contract whether received as payment or loan, as a trust for the benefit of the Surety and to use such money or other proceeds for the purpose of performing the contract and discharging the obligation of the bond, and for no other purpose, until the bond is completely exonerated."

When Uticon wrote American on October 21, 1968 that it could not meet its obligations and requested financial assistance, American called upon Bryant, Bryant-Greenville and Bryant Utilities, as indemnitors, to come forward with a plan to complete Uticon's work.

Bryant, Bryant-Greenville and Bryant Utilities after due consideration entered into the trust agreement hereinbefore mentioned. Pursuant to the agreement, American arranged a loan for Uticon in the sum of $400,000. The proceeds of the loan were deposited in a special account to be used for the payment of the cost of completing Uticon's bonded projects. In addition to the loan proceeds, the income from all bonded projects was also deposited to this account. The trust agreement carried forward and preserved the rights acquired by the parties in the indemnity agreement mentioned above. Pancoast, as the trustee, controlled the disbursement of the trust funds. There is not any evidence which justifies the court in holding that Pancoast did not disburse and spend the trust money strictly in accordance with the provisions of the trust agreement.

The evidence in the action does not, in the opinion of the court, support the Bank's theory that the proceeds of the Southcentral project were fraudulently transferred or conveyed to Bryant in violation of any legal right which the Bank held in the funds.

## DISREGARDING THE CORPORATE ENTITY

In Count VII the Bank seeks to hold Bryant liable for the note in question on the principle that where there is a near identity between two corporations their separate existences can be disregarded in order to prevent injustices.

The Bank asserts that the relationship existing between Bryant and Uticon was so close, and Bryant's manipulation of Uticon's affairs so complete that recognition of the separate entities will result in rank injustice to the Bank.

This action is *Erie* bound,[4] and Mississippi law controls the rights of the parties. The principles of law applicable to the issues presented on this theory of the action are, for the most part, well settled in Mississippi. Specifically, Mis-

4. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

sissippi recognizes that "[a] corporation is an entity separate and distinct from its stockholders, . . . ." Illinois Central R. Co. v. Mississippi Cotton Seed Prod. Co., 166 Miss. 579, 148 So. 371, 372 (1933); that "[o]rdinarily two or more corporations are separate and distinct entities although the same individuals are the incorporators of, or own stock, in the several corporations, and although such corporations may have the same persons as officers, . . . ." Murdock Acceptance Corporation v. Adcox, 245 Miss. 151, 138 So.2d 890, 895 (1962); and that "[a] corporation may retain its separate identity where its stock is owned partly or entirely by another corporation,[5] as well as where it is owned by natural persons, . . . ." Id. at 896.

■ The principal that where there is a near identity between two corporations, their separate existences can be disregarded in order to present injustices to a third party, has not been specifically considered in any Mississippi decision, which has been brought to the attention of the court. Judge Wm. Harold Cox of the Southern District of Mississippi applied this principle in 1968 in the case of Houston Oil Field Material Company v. Stuard. The application of the principle was affirmed on appeal. Houston Oil Field Material Company v. Stuard, 406 F.2d 1052 (5th Cir. 1969). The court is confident that Mississippi courts will recognize this principle, when and if the occasion presents itself. It is stated in 18 C.J.S. Corporations § 7(e) "The courts will ignore separate corporate entities in order to defeat a fraud, wrong, or injustice, at least where the rights of third persons are concerned."

The issue on Count VII becomes one of fact, however, rather than one of law. The question presented by the record is whether the facts revealed by the record sustain the Bank's position. The court must answer this question in the negative.

For the sake of brevity, the court will not undertake to discuss in detail the facts which lead the court to this conclusion. The court has already mentioned most of the material facts which relate to the issue in the foregoing part of this memorandum.

Suffice it to say, the evidence shows that Bryant became involved with Uticon while engaged in the promotion of its own business. The association with Uticon was not a profitable venture. It was in fact a disastrous one. Bryant's loss was over one half million dollars. By virtue of its undertaking with American, Bryant was tied to Uticon and was endeavoring to extricate itself from the dilemma in which it found itself.

■ Uticon and Bryant maintained separate corporate records and accounts. In all of Uticon's affairs the officers and directors of Uticon acted separately and apart from those of Bryant. The individuals occupying official positions with Bryant did nothing, as such officials, to justify the Bank in assuming that Uticon was the alter ego of Bryant, or that Bryant was conducting its business through Uticon. Uticon operated

---

5. Uticon only issued 20 shares of its stock when Bryant became a stockholder—five each to Bryant and Marcinkowska, four each to Cockman and Ford and two to Smith. At a later date, in the first part of 1968, at the suggestion of Bryant, Uticon increased its paid-in capital to 2000 shares, or $20,000. Bryant purchased 495 shares to bring its shares to 500, for which Bryant paid $5,000. The individual stockholders agreed to purchase their pro rata share of the increase, but were permitted to pay 10% in cash and give the corporation notes for the balance payable in February 1969. After the transaction had been concluded Uticon was advised by counsel that Mississippi law did not permit a corporation to accept promissory notes in payment in whole or in part for its stock. Miss.Code Ann. § 5309–35 (1972 Cum.Supp.). When the individual stockholders refuse to pay the notes, the stock was cancelled. Thus, it was, that Bryant was left holding 500 shares of the 506 issued and outstanding shares. Cockman and Smith held the other six shares.

its own business as a separate corporate entity.

In summary, the court finds that the Bank is not entitled to prevail in this action.

The clerk will enter the appropriate judgment.