Herbert L. **MARKOW**, Successor to J. Mark Stanley, as Trustee of Florida Carolina Lumber Company, Bankrupt, Appellant,

v.

Charles H. **ALCOCK** et al., Appellees.

No. 21502.

United States Court of Appeals Fifth Circuit.

Feb. 7, 1966.

H. I. Fischbach, Miami, Fla., for petitioner.

John Gale, Miami, Fla., Milton E. Grusmark, Miami Beach, Fla., William B. Roman, Harold Friedman, Miami, Fla., for Eduardo Morales, Pan American Bank of Miami and Southern Creosoted Lumber Company.

Feibelman, Friedman, Hyman & Durant, Miami, Fla., for Leo Robinson, Dania Bank and Southern Creosoted Lumber Co.

Before WISDOM and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

BENJAMIN C. DAWKINS, Jr., District Judge:

This is the third, and hopefully the final, occasion this matter has come before us for decision.[1]   The action is

---

1. The first was Coleman v. Alcock, 272 F.2d 618 (5 Cir. 1960), reversing a summary judgment in favor of the defendants on the ground that decision was foreclosed by res judicata by reason of a prior state court judgment in Central Bank & Trust Co. v. Davis, 102 So.2d 600 (Fla.1958). The second was Stanley v. Alcock, 310 F.2d 17 (5 Cir. 1962), reversing a summary judgment in favor of the defendants: "An examination of the disclosures made in this case and a consideration of the opposing inferences which may be drawn therefrom indicates a genuine issue of fact to be tried. We hold that the court below erred in deciding that there was no 'genuine issue as to material facts;' to the contrary, we find a clear issue as to the equitable ownership of Southern Creosoted, support-

brought by the Trustee in Bankruptcy of the Florida Carolina Lumber Company (Florida) in which, pursuant to § 70(e) of the Bankruptcy Act, he claims a mortgage transaction in favor of the defendant banks [2] was in fraud of general creditors of the bankrupt. The principal factual contention made by plaintiff is that the bankrupt owned, in law or in equity, the assets of the Southern Creosoted Lumber Company (Southern) which were mortgaged to the banks and executed upon in satisfaction of the debt of Florida.

Briefly reiterating the facts as more fully stated in our opinion in Coleman v. Alcock, 272 F.2d 618 (5 Cir. 1960), it appears that the capital stock of Florida was owned by certain individuals who acted as officers and directors of the corporation. In November, 1953, Southern was incorporated, the same individuals agreeing to subscribe to its capital stock in the same proportion as their ownership in Florida. Prior to that time, one of the officers of Florida, acting for the corporation, had agreed to purchase the assets of Florida Pole and Crossarm Company, either by Florida or its nominee, putting up a deposit of $3,750, which had been obtained from a lender on the note of Florida. One P. J. Davis, a stockholder and officer, put up the purchase price, taking a note and mortgage on the assets of Southern, which corporation was named to purchase and receive the assets of Florida Pole and Crossarm Company. Apparently no money was paid in for the stock of Southern until late 1954, but the separate corporate existence of Southern is not challenged here. Florida became insolvent in 1956, but Southern was still solvent and operating as of the date this suit was filed.

Sometime in 1956, when Florida was receiving adverse publicity because of a lawsuit brought against it by one McClellan, a former president and disgruntled shareholder, it found itself in financial difficulties. Because it was engaged in the factoring business, it never carried fixed assets and from its earliest beginnings operated on a very slim margin. The shareholders and officers settled the lawsuit, got rid of the dissident member, and entered into certain agreements with the defendant banks for refinancing Florida's factoring operation. In order to secure this refinancing, the shareholders, who also were officers and directors of both corporations, executed an open-end mortgage on the assets of both corporations, including those of Southern. When Florida subsequently failed, the banks executed against Southern pursuant to this agreement.

It is admitted by defendants that if Florida owned Southern, in law or in equity, this mortgage would be in fraud of the general creditors of the bankrupt in that it would have amounted to a voidable preference in favor of the banks. If Southern was a true separate entity, its assets would not be available to the Trustee for the benefit of creditors of the bankrupt.

The principal basis of appellant's contentions is the sequence of events occurring prior to the transaction of which he complains. In order to settle the McClellan lawsuit, adverted to above, the stockholders and parties in that suit entered into a stipulation of compromise, approved by the State court, in which it was asserted that Southern was a wholly owned subsidiary of Florida. The same day the settlement was approved by the State court the remaining stockholders signed a document refuting the assertion that Southern was a wholly owned subsidiary of Florida. It was these documents which prompted this Court in our previous reversal of summary judgment in favor of these defendants to say:

"Here, three of the parties to this action on the same day executed solemn writings which contradict

---

ed by competent evidence tending to prove the allegations made by plaintiff." 310 F.2d at 19.

[2]. Pan America Bank of Miami, Dania Bank, and Bank of Miami Beach.

each other on a very vital matter. One in search of the truth would have to delve deep to ascertain which of the statements was true. In such a situation, created entirely by parties to this suit whose credibility is inextricably bound up in its decision, the trier of the facts ought to be permitted to look the witnesses in the face as they testify in an effort to ascertain where the truth does lie. * * *"[3]

Upon trial on the merits, apparently by choice of all counsel, including the attorney for the Trustee, the parties presented no live witnesses, except the testimony of one Fahner, an officer of the Pan American Bank of Miami. When the case was submitted for decision, partially on the same record which had served as the basis of summary judgment, the trial judge relied principally upon the testimony and a letter written by Marion E. Sibley, the attorney who represented P. J. Davis in the McClellan lawsuit, to one Edwards, the corporations' accountant, clearly and reasonably explaining the reason for the stipulation and confirming its fictitious nature.[4] Of this letter the court below said, "[t]his letter convinces the court that said settlement stipulation was the device of one of Dade County's ablest attorneys acting in the interest of one particular client. It does not convince the court (contrary to all the other evidence) that there was any truth in the matter there asserted."

Sibley's client, P. J. Davis, who was a stockholder and officer of both corporations, had previously furnished the purchase price of the assets then held by Southern. It was he also who furnished the cash which was used by buy out Mc-

Clellan and put an end to that dispute—thus the need for his protection in the settlement transaction.

■ The issue to be decided here, as suggested by our earlier opinion and now posed by these parties, is whether in fact Southern was a wholly owned subsidiary of Florida, or whether in equity Florida may be considered as owner either because the corporate existence of Southern may be disregarded or the defendant banks are estopped to deny the judicial stipulation. We hold in the negative and affirm the decision of the court below.

The record is totally devoid of any concrete evidence supporting appellant's contention that Florida in fact owned Southern. Moreover, there is no serious basis for finding that Southern is not a legally constituted separate corporate entity. Therefore, the proposition that Southern was the wholly owned subsidiary of Florida in law or equity is untenable.

■■ As a general rule a corporation normally will be counted as a legal entity separate from the persons composing it until sufficient reasons to the contrary appear. A number of factors are to be considered in determining whether a specific case should be viewed as one in which equity demands that the corporate fiction be disregarded. Some of these which bear particularly upon the case here presented are: (1) are the formal legal requirements observed; (2) is the "subsidiary" adequately financed or does the "parent" furnish the capitalization, see Annot. 63 A.L.R.2d 1051; (3) by whom are salaries and expenses paid; (4) do the directors of the "subsidiary" act in the independent and primary interest of the "parent"; (5) are the two operations so integrated through the

---

3. Stanley v. Alcock, 310 F.2d 17, 18, 19 (5 Cir. 1962).

4. In his letter dated February 22, 1956, and also in his deposition, Sibley stated that it was his desire to bind the assets of both Florida and Southern jointly for their indebtedness to P. J. Davis. However, under Florida law, in his opinion it was *ultra vires* for one corporation to guarantee the debt of another without specific authorization in its charter; but he believed the stipulation would estop the parties to it to plead *ultra vires* or to deny its truthfulness, thus accomplishing what could not otherwise have been done. It is noteworthy that Southern subsequently amended its charter so that it could mortgage its assets to the defendant banks in the transaction here under attack.

commingling of funds, interactivities and common direction and supervision that they should be considered as one enterprise; and (6) generally, is one corporation so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of the other? See Fish v. East, 114 F.2d 177 (10 Cir. 1940); 18 Am.Jur.2d, Corporations § 17 (1965).

Application of the facts of this case to the above tests convinces us that the two corporations were separate and distinct legal entities, notwithstanding the fact that they had common shareholders, directors and officers. See Richmond & Irvine Constr. Co. v. Richmond, N., I. & B. R.R. Co., 68 F. 105, 34 L.R.A. 625 (6 Cir. 1895). The only fact tending to show an alter ego relationship of Southern vis-a-vis Florida is that only $500.00 was paid in for all of the common stock of a going corporation with an estimated net worth of $93,000.00, and that this sum was paid by checks drawn on Florida, the bankrupt. This is of comparatively little significance when it is noted that Southern was indebted to Davis in a sum equal to the purchase price of all its assets.

In Fox Jewelry Co. v. Lee, 264 F.2d 720, 721 (5 Cir. 1959), cert. denied, 361 U.S. 815, 80 S.Ct. 55, 4 L.Ed.2d 62, one man owned two corporations. When one became insolvent the Trustee in Bankruptcy sought to administer the affairs of both, contending the solvent corporation was merely the alter ego of the bankrupt. Although the holding is not conclusive on the issue of separateness, we there commented that the "control of the two corporations by the one man stockholder and president of each, the fact that they act together, and especially the fact that the purchasing of their stocks of goods are all done by the same man, is not determinative of the question whether the corporations are in fact, as in every legal aspect they appear to be, two corporations or simply one * * *".

264 F.2d at 721. See also Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293; Arnold v. Phillips, 117 F.2d 497 (5 Cir.1941); cf. Fish v. East, 114 F.2d 177 (10 Cir. 1940), where the two corporations were so much operated as a single enterprise as to constitute one the subsidiary or instrumentality of the other.

When it is considered here that the two corporations were located in different cities, were legally constituted, maintained separate books and records, and that the factoring business has failed where the creosoting business has succeeded, it becomes plainly apparent that no sufficient reason exists to disregard the separate corporate existence of Southern. In short, this record simply does not show that Southern was the agency, instrumentality, adjunct or alter ego of Florida.

■ Turning now to appellant's contention that a judicial estoppel is applicable by reason of the stipulation in settlement of the McClellan matter as against the defendant banks, it does appear as a general rule that parties entering into stipulations during the course of a judicial proceeding are estopped to take positions inconsistent therewith. See 31 C.J.S. Estoppel § 120. But this rule does not apply if the estoppel is urged in a subsequent proceeding where the parties are different. See Lawrence v. Vail, 166 F.Supp. 777 (D.C.S.C.1958); Werbe v. Holt, 100 F.Supp. 392 (W.D. Ark.1951), rev'd on other grounds, 198 F.2d 910.

■ Here, it not only appears that the two proceedings were between different parties but also that the defendant banks were not parties to the stipulation in the McClellan suit at all. Rather, having been named as defendants there, they did not answer pending the court's disposition of their motions to dismiss for failure to state a claim. The banks were not included in the settlement stipulation,

the case having been dismissed with prejudice as to them.[5]

For the reasons given the decision of the District Court is

Affirmed.

5. Appellant further contends that the banks acted with knowledge of the stipulation. We agree with the court below finding the facts to be to the contrary and concerning the ownership of Southern making it unnecessary to answer this contention, and, moreover, we note that there is nothing in evidence to suggest that any representation ever was made to the banks that Southern was a wholly owned subsidiary of Florida.