**PLUMBERS LOCAL UNION NO. 519 OF MIAMI, FLORIDA, a labor organization, et al., Plaintiffs,**

v.

**SERVICE PLUMBING CO., INC., and AJA Plumbing Co., Inc., Florida Corporations, Defendants.**

**No. 74-1253-Civ-CF.**

United States District Court, S. D. Florida.

Oct. 9, 1975.

Kaplan, Dorsey, Sicking & Hessen, P. A., Miami, Fla., for plaintiffs.

Ronald L. Davis, P.A., Miami, Fla., for Service Plumbing.

Sibley, Giblin, Levenson & Ward, Miami Beach, Fla., for AJA Plumbing.

## MEMORANDUM OPINION

FULTON, Chief Judge.

### I. BACKGROUND

On September 27, 1974, Plumbers Local Union No. 519 of Miami, Florida ("Union") and Sam Long, Elmer Frischolz, H. D. Salyers, Joseph L. Cole, Robert E. Lee, Ben Markowitz, Joseph Goldman, and Robert Hildebrandt as Trustees of Plumbers Local Union No. 519 Health & Welfare Fund, Pension Fund, Vacation Benefit Fund, and Joint Apprentice and Educational Committee ("Trustees") brought suit against Service Plumbing Co., Inc. ("Service") and

AJA Plumbing Co., Inc. ("AJA") to enforce a collective bargaining agreement signed by the defendant Service. Jurisdiction was based upon the Labor Management Relations Act, 29 U.S.C. § 185(a).

Plaintiffs' complaint covers the time period from April 16, 1973 through November 4, 1974. Two collective bargaining agreements entered into between the plaintiff Union and Service were admitted into evidence: the original contract ("agreement"), Exhibit 1–B, which covered the time period April 16, 1973 to April 15, 1974; and a supplemental contract ("supplemental agreement"), Exhibit 1–A, which provided that the terms and conditions of the agreement would remain in effect until April 30, 1975, except as changed in the supplemental agreement. Examination of the supplemental agreement indicates that the changes consisted of increases in the wage rates and hourly fringe benefit payments, and did not consist of substantive changes.

Plaintiffs have alleged that the defendant AJA is bound by the agreement signed by Service because of Article I, section 6(b) of the agreement which provides in pertinent part:

> "If any Employer . . . controls or operates any other business within the trade and territorial jurisdiction of the Union, such other business entity shall either have a signed Agreement with the Union or this Agreement shall be interpreted as including such business entity under the term 'Employer'."

Alternatively, plaintiffs have alleged that the defendant AJA was an alter ego of Service so that AJA was bound by the agreement signed by Service.

Plaintiffs have contended that the defendants are obligated to pay the following sums to the plaintiff Trustees: the amount of fringe benefit contributions due and owing by each defendant, as provided in Article VI, sections 1 and 2

of the agreement, and Article I, sections C and D of the supplemental agreement; a 10% service charge on the late contributions, as provided for in Article VI, section 6 of the agreement; a 10% service charge on late contributions as to contributions relating to Service employees which were paid by Service but were paid late, as provided in Article VI, section 6 of the agreement; plaintiffs' accountants' fees, attorneys' fees and costs. In addition, plaintiffs have contended that the defendants are obligated to pay to the individual employees "waiting time pay" as defined in the agreement in Article VI, section 6, as follows:

> "If contributions or withholdings required to be paid are not paid in full [timely] . . ., the Employer shall be considered delinquent. In such case, the Employer shall pay *to each employee* on whose behalf the delinquent payments were to have been made, a sum equal to eight (8) hours of fringe benefit contributions and withholdings, as waiting pay . . . " (emphasis added)

Thus, waiting time pay is an amount of money due to the individual employees if the fringe benefit contributions were not made to the trustees in the time period provided in the agreement.

In their answers AJA denied that it was bound by the agreement entered into between Service and the Union, and Service denied that the monies described above were due and owing.

In their joint pre-trial stipulation filed with the Court on April 17, 1975, the parties stipulated that the following facts would require no proof at trial:

1. The plaintiffs, as Trustees, have standing to bring this suit.
2. The plaintiff Union has standing to bring this suit.
3. The jurisdictional requirements for bringing this suit have been met.

4. Defendants were engaged in a business affecting commerce within the meaning of the Labor Management Relations Act.

5. Copies of the agreement and the supplemental agreement, attached to the complaint, are genuine.

6. The plaintiff Trustees are entitled to recover their attorneys' and accountants' fees should any delinquencies be shown to be due.

The case was tried before the Court without a jury on July 14, 1975. At the conclusion of presentation of all the evidence, the Court ordered the parties to submit post-trial briefs. The Court has carefully considered all of the evidence and all of the parties' submissions.

## II. PLAINTIFF'S CAPACITY TO SUE

At the conclusion of the trial and in their post-trial briefs, counsel for the defendants asserted that plaintiffs had failed to prove their capacity to maintain this action as they had introduced no evidence to establish that the plaintiff Union was in fact a legally organized union, that any of the named plaintiffs were the trustees of the various trusts, or that the trusts were actually in existence. In their reply memorandum, plaintiffs correctly noted that Rule 9(a) of the Federal Rules of Civil Procedure provides that it is not necessary to aver capacity of a party to sue or the legal existence of an organized association of persons that is made a party, except to the extent required to establish jurisdiction. "When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue . . . or the authority of a party to sue . . . in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge." Fed.R.Civ.P. 9(a).

■■ If defendants wished to raise the issue of plaintiffs' capacity, Rule 9(a) required them to do so by a specif-

ic negative averment, which includes supporting particulars. Neither of the defendants' answers contained such specific denials. Rather, each defendant only denied its knowledge of plaintiffs' capacity, which is insufficient to raise the issue of plaintiffs' capacity. *Tractortechnic Gebrueder Kulenkempft & Co. v. Bousman*, 301 F.Supp. 153 (E.D.Wis. 1969); *Volkswagenwerk Aktiengesellschaft v. Dreer*, 253 F.Supp. 37 (E.D.Pa.1966); *Montellier v. United States*, 202 F.Supp. 384 (E.D.N.Y.1962), *aff'd on other grounds*, 315 F.2d 180 (2d Cir. 1963). Generally, failure to raise the issue of plaintiffs' capacity by a specific negative averment has been held to constitute a waiver of that defense. *Montellier v. United States, supra. See Summers v. Interstate Tractor and Equipment Co.*, 466 F.2d 42 (9th Cir. 1972); *Marston v. American Employers Insurance Co.*, 439 F.2d 1035 (1st Cir. 1971).

In their pre-trial stipulation, the parties stipulated that the plaintiff Union and the plaintiffs Trustees have standing to bring this suit. The stipulation does not list the capacity of plaintiffs as an issue of fact to be litigated.

■ For all of the foregoing reasons, the Court concludes that defendants' tardy attempt to raise the issue of plaintiffs' capacity is unfounded particularly in light of the parties' stipulation. Since the parties stipulated that the plaintiffs have standing to bring this action, no evidentiary finding by the Court is necessary.

## III. FACTS

Except for the issue of plaintiffs' capacity to sue, discussed above, defendants have not disputed the underlying facts. Defendant Service was in the business of plumbing contracting and repairs with its principal place of business in Dade County, Florida. Service's business affected commerce within the meaning of the Labor Management Relations Act. Service paid the Union wage scale to its plumbers. About three

months prior to the incorporation of AJA, in January or February, 1974, Somerset Construction Company invited Fred Krutel, president of Service, to bid on the plumbing subcontracting job at the Costa del Sol, at 36th Street, northwest area of Dade County, Florida. The work bid on consisted of installation of plumbing facilities in new construction. Krutel's bid was successful. Steven D. Taylor, vice president of Service, testified that AJA was formed specifically to perform the Costa del Sol job. Krutel testified that AJA's incorporation in April, 1974 was after he was awarded the Costa del Sol job. Irwin Stolberg, Secretary-Treasurer of Service, testified that AJA was formed to perform the Costa del Sol job because it was a non-union job, that Service could have performed it but would have had to pay the higher union wage scale and "probably never could have gotten the job because our work costs would have been higher." Transcript of Trial Proceedings ("TT") at 51. Stolberg testified that Nat Fectner, a master plumber, was paid a fee for use of his license to allow AJA to do business as a plumbing contractor. Fectner performed no services or labor for AJA, but his license was used, rather than Taylor's since Taylor's license was being used by Service. When AJA was formally incorporated, Krutel, Taylor and Stolberg were its officers and directors.

The evidence showed that Service and AJA interchanged and commingled funds and employees. The two corporations had common officers, stockholders, and managers, and were both operated from a common office. The capitalization for each corporation was, at times, furnished by the other corporation and the salaries and expenses of one were, at times, paid by the other.

Stephen Kass, a staff accountant employed by Caplan, Morrison, Brown & Company, a certified public accounting firm in Miami, Florida, testified that he had inspected the books and records of Service and AJA and performed an audit of both companies. Composite Exhibit No. 9, summaries of the payroll records and supplemental schedule; Exhibit No. 8, a shop audit of Service for the period April 16, 1973 through November 4, 1974; and Exhibit No. 10, a shop audit of AJA for the period April 1, 1974 through May 1, 1975, were received in evidence. Kass testified that the purpose of a shop audit is to compare the hours worked by the employees of a company with the hours reported to the administrator of a Trust Fund to find out how much money may be due to the Fund. Kass testified that he prepared summaries of his findings and that they had been received in evidence as Composite Exhibit No. 9, Exhibit No. 8 and Exhibit No. 10.

Kass testified that as to Service he found that the total delinquent amount due to the Trustees was $9,648.82. Examination of Exhibit No. 8 reveals that this figure comprises a finding of total delinquent contributions of $2,822.27, the 10% service charge on those delinquent contributions of $282.23, and the 10% service charge on delinquent contributions paid untimely in the amount of $6,544.32. In addition, Kass testified that he computed the waiting time pay due to the employees of Service and that this amounted to a sum of $14,248.32. As to AJA, Kass testified that assuming AJA was bound by the terms of the agreement and supplemental agreement, he found that the total delinquent amount due to the Trustees was $19,653.17. "TT" at 77. Examination of Exhibit No. 10 reveals that this figure comprises a finding of total delinquent contributions of $17,866.52, and the 10% service charge on those delinquent contributions of $1,786.65. Kass testified that he computed the waiting time pay due to the employees of AJA and that this amounted to a sum of $4,019.36. "TT" at 78.

Plaintiffs subpoenaed the books and records of both defendant corporations for production at trial, so that they could be identified by the accountant

and that his summaries could be received. The defendants did not produce the books and records at the trial. In lieu thereof counsel for both defendants stipulated and waived the requirement that the accountant's report had to be supported by the original books and records, and agreed that the reports themselves could come into evidence subject only to the right of cross-examination of the accountant who prepared the reports. "TT" at 23–24. After the completion of Kass' direct testimony, counsel for Service stated that he had no questions. Counsel for AJA asked a few questions concerning Kass' preparation of Composite Exhibit No. 9 and his method of computation of total delinquent contributions owed by AJA. "TT" at 79–84. He did not in any way diminish the credibility or accuracy of Kass' testimony and reports as to the amounts he found due and owing by either defendant corporation. Counsel for both defendants stipulated that the amounts which Kass testified he found to be due and owing have not been paid. "TT" at 27. Thus, the Court accepts Kass' testimony as uncontroverted.

Howard Farbish, a supervisor and certified public accountant employed by Caplan, Morrison, Brown & Company, testified that Kass was under his supervision and control when he prepared Exhibits 8, 9 and 10, that he reviewed these exhibits, and that in his opinion as a certified public accountant Exhibits 8 and 10 correctly reflect the monies due from Service and AJA to the plaintiff Trustees. He testified that in his opinion the testimony of Kass with regard to the amount of waiting time pay due to the individual employees of Service and AJA was correct and that the computation was correct. Farbish testified that his firm's fee for its services in connection with these audits was $1,694.00, which was based upon an hourly rate of $22 an hour for staff time and that this rate was generally consistent with the rates charged by other accounting firms. Neither defense counsel asked any questions of this witness. "TT" at 84–88.

## IV.  ALTER EGO

The Court finds and concludes that on the basis of the standards established by the Fifth Circuit in *Markow v. Alcock*, 356 F.2d 194 (1966), plaintiffs have established by the greater weight of the evidence that the two defendant corporations were intertwined and related such that the corporate fiction of a separate identity of the two defendants was overcome.

■   The operations of each corporation were so integrated through the commingling of funds, interactivities, and common direction and supervision that they can only be considered as one enterprise. The defendant corporations were so organized and controlled and their businesses were conducted in such a manner as to make them merely agencies, instrumentalities, adjuncts or alter egoes of one another. *Markow v. Alcock*, 356 F.2d 194, 197–98 (5th Cir. 1966); *Fisher v. East*, 114 F.2d 177 (10th Cir. 1940).

The principals of the defendant corporations themselves testified that the only reason AJA was formed was to do the Costa del Sol job at non-union rates, that Service could have done the job but would have had to pay the union scale wage rates, and that if their bid had been based upon union rather than non-union rates they never would have obtained the job.

The Court concludes that Service and AJA are, in the eyes of the law, a single entity and as such are both bound by the agreement and the supplemental agreement and are liable for the obligations of one another. *See Feagan v. Drywall, Inc.*, Case No. (FL)–74–35–Civ–JE (S. D.Fla., May 20, 1975, Eaton, J.). "Corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud." *Fish v. East, supra,* 114 F.2d, at 191.

Moreover, the provisions of Article I, Section 6(b) of the agreement itself provide that AJA is bound by its terms and conditions.

## V. WAITING TIME PAY

■ It appears that the Union does have standing to maintain an action for the use and benefit of the employees for the receipt of waiting time pay. No evidence was introduced which tended to show that Service did not freely and voluntarily enter into the agreement with the plaintiff Union, or that it was coerced into agreeing to any of its terms, including Article VI, Section 6, which provided for waiting time pay to the individual employees. Since the failure of the defendants to pay the required fringe benefit contributions could adversely affect an employee's pension rights and health insurance coverage, and since the amount of such damage is difficult to calculate, this provision is valid as a provision for liquidated damages due to the employees. Liquidated damages for employer breaches of the fringe benefit provisions of collective bargaining agreements have been allowed in *Sherman v. Carter*, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957); *Jensen v. Garvison*, 274 F.Supp. 866 (D. Ore.1967); and in *Schlecht v. Hiatt*, 271 F.Supp. 644 (D.Ore.1967), *rev'd on other grounds*, 400 F.2d 875 (9th Cir. 1968). Similarly, the Court concludes that the waiting time provision freely entered into by Service is a valid liquidated damages provision, and applies to both Service and its alter ego AJA. Thus the Court is persuaded that the provision of the agreement which provides for waiting time pay is enforceable as and for the payment of liquidated damages and is not a penalty as the Court first surmised.

■ However, no evidence was adduced to identify the employees who are entitled to payment of waiting time, nor has there been any evidence as to how much each employee is entitled to receive. In view of the absence of this type of proof, the Court is unwilling to pay the Union the amount that has been determined to be due to the employees for this purpose, which amount is in the total sum of $18,267.68. For the reasons stated, no recovery of waiting time shall be included herein, nor in the Judgment to be entered hereon; but the omission of a recovery for waiting time is without prejudice to those employees who are entitled to receive the same, any or all of whom may seek recovery thereof by separate action.

## VI. CONCLUSION

For all of the foregoing reasons, it is ordered and adjudged that the plaintiff Trustees are entitled to a Judgment against both defendants, jointly and severally, as follows:

1. The sum of $29,301.99 representing the fringe benefit contributions and service charges due to the Trustees on behalf of employees employed by the defendants under the jurisdiction of the agreement and supplemental agreement, plus plaintiffs' accountants' fees in the sum of $1,694.00, plus attorneys' fees in the sum of $2,500.00, plus the costs of this action to be taxed by the Clerk.

2. Simultaneously with the entry of this Memorandum Opinion, the Court shall enter its Final Judgment which shall incorporate by reference these rulings.