**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**DEAN VAN LINES, INC., and Dean
International, Ltd.,
Defendants-Appellants.**

**No. 75–1109.**

United States Court of Appeals,
Fifth Circuit.

May 10, 1976.

---

John H. Wilbur, Jacksonville, Fla., for defendants-appellants.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Anthony W. Gross, Admiralty & Shipping Section, Dept. of Justice, Paul Blankenstein, Leonard Schaitman, Richard A. Olderman, Appellate Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DYER, CLARK and GEE, Circuit Judges.

DYER, Circuit Judge:

█ The district court, although recognizing that there was insufficient evidence to justify "piercing the corporate veil" held Dean, the parent corporation, liable for the acts of Condyne, its subsidiary, on a theory of unjust enrichment. We reverse.

From early 1965 to early 1967, the Belgian corporation of S.A. Condyne acted as freight forwarder for the Agency for International Development, United States Department of State (AID). Under the terms of its contract with AID, Condyne charged gross ocean freights. At the same time, unknown to AID, Condyne was receiving rebates from the steamship lines with which it had contracted. Upon learning of the rebates, the United States brought the present suit against Condyne's American corporate parent, Dean Van Lines, Inc.,[1] seeking an accounting and collection of the withheld sums.[2]

---

1. At the time the freight contracts were entered into, Condyne's parent was Dean Export International, Ltd., whose name was later changed to Dean International, Ltd. of California. In 1970, Dean International merged with its parent, Dean Van Lines, Inc. In 1972, the name of the merged corporation was changed to Pan American Van Lines, Inc. It is not disputed that the successor corporation would be responsible for any liability imposed upon any of the Dean corporations in this proceeding. Therefore, these corporations will be referred to collectively as "Dean."

2. Suit was also filed against Condyne, but that proceeding was apparently stayed pending resolution of this case.

The district court found that Condyne had falsely certified to AID that it was billing for the lowest net rates available when in fact it was billing for gross rates, that is, without credit for the rebates. The court thus concluded that Condyne had overcharged the United States by the amount of the rebates. This conclusion is not questioned on appeal. The court went on to conclude that the overcharge could be recovered from Dean, Condyne's parent, on a theory of unjust enrichment.

The theory of unjust enrichment argued for by the government and accepted by the district court is novel. After the overcharge had occurred, Dean sold the stock of Condyne to Transport Holding, A.G., a Liechtenstein corporation. The government contends that if Condyne had not overcharged the government, the asset value of Condyne would have been decreased by the amount of the overcharge. This decrease in asset value necessarily would be reflected in the sale price, and would have reduced the sale price by a corresponding amount. Thus, in its view, the amount received by Dean upon sale of the Condyne stock was inflated by the amount of the overcharge, and "in equity and good conscience" the inflated amount should be paid by Dean to the government.

In support of its position, the government relies upon the broad generalization that unjust enrichment "will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund." *Bayne v. United States*, 1876, 93 U.S. 642, 643, 23 L.Ed. 997, 998. However, these principles of law do not inexorably lead to the conclusion proffered by the government, for here present are competing state interests[3] in the preservation of corporate identity. As stated by the Florida Supreme Court:

> Those who utilize the laws of this state in order to do business in the corporate form have every right to rely on the rules of law which protect them against personal liability unless it be shown that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing of the corporate veil.

*Robert's Fish Farm v. Spencer*, Fla.1963, 153 So.2d 718, 721. California also demands that the corporate identity be preserved unless exceptional circumstances are shown to exist. Thus, under California law, in order to hold a parent corporation liable for the acts of its subsidiary, it is not enough that observance of the separate corporate identities would be unjust or inequitable. As a condition to liability, it must also be shown that there is such a unity of interest and ownership that the individuality of the subsidiary as a distinct entity has ceased. *Marr v. Postal Union Life Ins. Co.*, 1940, 40 Cal.App.2d 673, 105 P.2d 649; *Pan Pacific Sash & Door Co. v. Greendale Park, Inc.*, 1958, 166 Cal.App.2d 652, 333 P.2d 802, and cases cited therein.[4]

The government admits in post-trial memoranda, and the district court recognizes in its findings of fact and conclusions of law, that Dean cannot be held liable as the "alter ego" of Condyne and that the facts are insufficient to "pierce the corporate veil." With these admissions, the state policies set out above come fully into play. In order to hold for the government, we must find a paramount interest on its part sufficient to overcome those policies.

---

3. Dean is incorporated in California. Personal jurisdiction over Dean is based on the fact that they are doing business in Florida. Both states have a legitimate policy interest in the outcome.

4. Since both Florida and California have similar policies in this respect, we find it unnecessary to make a choice-of-laws determination.

The government relies upon *American Cyanamid Co. v. Wilson & Toomer Fertilizer Co.*, 5 Cir. 1931, 51 F.2d 665, to support its position that an action for unjust enrichment can be maintained against a parent corporation on account of the wrongs of its subsidiary. The facts of *American Cyanamid* are, to some degree analogous. That case, however, goes far towards supporting the position of Dean. There, the plaintiff had a contract with the subsidiary, whereby the subsidiary agreed to sell plaintiff phosphate rock at a certain price, provided, however, that plaintiff would be entitled to a rebate if the subsidiary sold phosphate rock to others at a lower price. The parent corporation then leased from the subsidiary its mines and agreed to deliver phosphate to the subsidiary in quantities sufficient to meet its outstanding contracts, including the contract with the plaintiff. When the parent then sold phosphate to third persons at a lower price than that given to plaintiff, plaintiff sued the parent for the rebate due under its contract with the subsidiary. This court noted that any rebates due the plaintiff were in the hands of the subsidiary and not those of the parent:

> It clearly appears in the present record that this difference [the rebates] went to the phosphate company [the subsidiary], and is among its assets and liable to its debts, and cannot reach the coffers of the defendant [the parent] as belonging to it until the phosphate company is liquidated and its affairs settled. *The count for money had and received fails just here.* [emphasis added].

51 F.2d at 671. In the present case, the overcharge due the government is similarly among the assets of the subsidiary, Condyne, and cannot reach the coffers of the parent until the subsidiary is liquidated and its affairs settled.

The government attempts to maneuver around the logic of *American Cyanamid* by pointing out that here the stock of the subsidiary was sold subsequent to the time the overcharges occurred, and that the purchase price of the stock was necessarily increased by the amount of the overcharges.[5] Although this additional fact was not present in *American Cyanamid*, it does not change the force of that holding. At the time of sale, Condyne had among its assets the overcharges due the government. But at the same time, Condyne had a corresponding legal obligation to repay that amount to the government. Since the overcharges retained were exactly offset by the legal obligation to repay those overcharges, the net assets of Condyne remained unchanged. Thus, as long as Condyne remained a going concern, its shareholder, Dean, could not be unjustly enriched through the sale of its Condyne stock.

Of course, the situation envisioned in *American Cyanamid*, a subsidiary liquidation, is completely different. Upon liquidation, the legal obligation of the subsidiary to pay the overcharge ends. At that point, the asset represented by the wrongfully retained overcharge is no longer offset by a corresponding liability, and there is an unjust increase in the assets of the subsidiary distributed to its shareholders. But no such situation is here present. There is no showing that the government cannot pursue its claim against Condyne.

The government also relies on *Pierce v. United States*, 1921, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697; *Neill v. Phinney*, 5 Cir. 1951, 245 F.2d 645; and *Sweet v. Lang*, 8 Cir. 1926, 14 F.2d 762, in support of its argument that it may trace assets from Condyne into the hands of Dean. However, these cases concern the liability of shareholders of a corporation no longer in exist-

---

5. There is no evidence in the record that the purchase price was inflated by the amount of the overcharges. The government seems to argue that, as a matter of law, such an increase in purchase price should be presumed. But the record points to a contrary conclusion. Here, the corporation which purchased the Condyne stock from Dean was headed by an individual who was president of Condyne at the time of the AID transactions. This would indicate that the purchaser had knowledge of the claim by the government against Condyne, and considered the potential liability for that claim in arriving at a purchase price. However, as pointed out below, this fact is not necessary for our conclusion.

ence. In that circumstance, the stockholders of a corporation may become liable for claims against the corporation to the extent of the property distributed to them upon liquidation. But this is essentially the same rule expressed in *American Cyanamid* —only when the corporation is liquidated will the shareholders or the parent corporation be unjustly enriched if they are allowed to retain assets of the corporation free from the debts of the corporation. If there is no liquidation, the corporation remains liable for its debts, and an action will not lie against the shareholders.

Finally, we reject the theory urged by the government because of the far-ranging implications such a theory would have on state doctrines of shareholder liability. First, there would be no reason to distinguish a claim for unjust enrichment brought by the government from one brought by a private individual. Second, the theory would seem to apply equally to actions in tort as to actions founded in contract.[6] Third, as counsel for the government conceded at oral argument, application of the theory would not be dependent on the fact that Dean is the sole shareholder of Condyne. It would apply to an action against numerous shareholders of a corporation. Without a compelling reason to do so, we will not in such drastic degree rewrite established state law of shareholder liability.

REVERSED.

---

6. At oral argument, counsel for the government was asked whether a person injured on Condyne property could, after the sale of Condyne, sue Dean on a theory of unjust enrichment. Counsel was unable to distinguish this tort case from the contract case presently before us. We see no distinction.