Walter G. JOHNSON

v.

WARNACO, INC.

Civ. A. No. J75–30(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

Sept. 3, 1976.

W. F. Goodman, Jr., Jackson, Miss., for plaintiff.

Sherwood W. Wise, Joseph P. Wise, Jackson, Miss., Kenneth R. Logan, Simpson, Thacher & Bartlett, New York City, for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

This suit was filed pursuant to 28 U.S.C. § 2201, alleging that the sale by Warnaco of one of its subsidiaries constituted a fraud upon the plaintiff and wilful interference with the business relationship between him and the subsidiary, and seeking a Declaratory Judgment from this Court of the rights and responsibilities of the parties, arising from the transactions here in question. The Complaint alleges that Warnaco is a nonresident foreign corporation, organized under the laws of and having its principal place of business in Connecticut, and is subject to service of process in this state under the provisions of the Mississippi Long Arm Statute, Miss. Code Ann. § 13–3–57 (1972).

On July 10, 1975, Warnaco filed its Combined Motion for Judgment on the Pleadings and Summary Judgment, alleging in part that it is not subject to service of process under the Mississippi Long Arm Statute. At the close of arguments on this Motion on August 13, 1975, the Court re-served ruling thereon pending completion of discovery. The Motion was re-argued on November 14, 1975, and on December 3, 1975 this Court entered its Order denying jurisdiction on the basis of the "contract" and "tort" theories of the Long Arm Statute, but reserving ruling on the issue of whether Warnaco was "doing business" in Mississippi, and directing the parties to present evidence thereon at the trial on the merits of this cause.

This case was tried to the Court sitting without a jury on December 3 and 4, 1975. Based upon all competent evidence of record we now find that the Mississippi Long Arm Statute provides no basis for the assertion of jurisdiction over the defendant Warnaco, and this cause must therefore be dismissed for lack of in personam jurisdiction. Although we have previously entered an order denying jurisdiction on the "contract" and "tort" theories, this Memorandum Opinion will deal with these theories as well as the question of "doing business", so that in the event of an appeal the Appellate Courts may have the benefit of our rationale of decision on all issues. Inasmuch as this Court lacks in personam jurisdiction of this cause of action, we express no opinion herein on the ultimate merits of the dispute between the parties.

## BACKGROUND

On November 1, 1957, Jackson Properties, Inc. and Giles, Inc., Mississippi corporations of which Johnson was the sole shareholder, as Lessors, and Gus Mayer Co., Ltd. of Mississippi (Gus Mayer I), as Lessee, entered into a lease contract with a term of approximately 25 years covering certain property on East Capitol Street in Jackson, Mississippi. Under the terms of this lease Gus Mayer I agreed to operate on these premises "a retail store of generally the same type and quality heretofore conducted on said premises by Giles, Inc.", which, according to the testimony of Johnson was "a very fine lady's and gentleman's ready to wear store carrying merchandise from . . . popular priced to the best ready

to wear. Furs, shoes, cosmetics, men's clothing, millinery, popular priced garments up to the very highest fashions and the highest prices in Mississippi." Gus Mayer I also agreed to carry "a reasonable inventory commensurate with the inventory" which had been carried by Giles and to pay the Lessors as rental an amount to be determined as a percentage of annual gross sales, with a minimum annual rental of $50,000.

On July 21, 1969, an Agreement of Merger was entered into between Gus Mayer I and Gusco Clothing Stores, Inc., a wholly owned subsidiary of Warnaco, with Gusco being the surviving corporation and Gus Mayer I the merged or extinct corporation. Contemporaneously therewith Gusco's name was changed to Gus Mayer Stores, Inc. (Gus Mayer II). Prior to this merger, in response to a request made by Jack M. Weiss, president of Gus Mayer I, Johnson approved and consented thereto on behalf of the lessors of the property in question, Jackson Properties, Inc. and Giles, Inc.

On August 1, 1973, this leased property was conveyed by warranty deed from Giles and Jackson Properties to Walter G. Johnson, plaintiff herein and on the same date, they assigned to Johnson the lease contract on this property with Johnson assuming all of the obligations of the Lessor thereunder. The undisputed evidence reveals that for each of the years 1959 through 1974 the annual rental paid by the Lessee of this property had exceeded the $50,000 minimum.

Gus Mayer II operated as a subsidiary of Warnaco from the date of the merger until April 12, 1974, when Warnaco sold all of the stock of Gus Mayer II to DAC Stores, Inc., of Memphis, Tennessee (DAC), for a consideration of $5,917,000 cash and a promissory note in the principal amount of $2,860,000. Almost immediately after its purchase by DAC, Gus Mayer II began having financial difficulties and in less than a year had defaulted on its obligations under its promissory note to Warnaco. On March 5, 1975, Warnaco sent DAC a formal Notice of Default, and when DAC failed to satisfy the amount due and payable within ten days

thereafter, Warnaco exercised its right under the stock purchase agreement to vote the stock of Gus Mayer II, amending the by-laws of Gus Mayer II, removing from office and replacing its directors, and instructing the directors of Gus Mayer II to take all corporate action necessary to place Gus Mayer II into Chapter XI Bankruptcy.

On March 18, 1975, Gus Mayer II filed a Petition under Chapter XI of the Bankruptcy Act in the United States District Court for the Western District of Tennessee, which was pending at the time of this trial. On September 26, 1975, with the consent of Johnson, Gus Mayer II subleased the East Capitol Street property to Inter-American Stores, Inc.

Johnson's Complaint, filed herein on February 10, 1975, prior to DAC's default on its promissory note to Warnaco and the subsequent filing of the Bankruptcy Petition by Gus Mayer II, alleges that DAC was dissipating the assets of Gus Mayer II and refusing to comply with the terms of its lease with Johnson, that the sale of Gus Mayer II to DAC by Warnaco constituted a fraud against Johnson as a creditor of Warnaco, and that Warnaco has also thereby committed the tort of wilfully interfering with the business relationship between Johnson and Gus Mayer II.

### THE MISSISSIPPI LONG ARM STATUTE

Johnson contends that this Court has in personam jurisdiction over Warnaco by virtue of the provisions of the Mississippi Long Arm Statute, Miss. Code Ann. § 13–3–57 (1972), which provides in pertinent part:

Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident of this state, or who shall do any business or perform any character of work or service in this state,

shall by such act or acts be deemed to be doing business in Mississippi. Such act or acts shall be deemed equivalent to the appointment by such nonresident of the secretary of state of the State of Mississippi, or his successor or successors in office, to be the true and lawful attorney or agent of such nonresident upon whom all lawful process may be served in any actions or proceedings accrued or accruing from such act or acts, or arising from or growing out of such contract or tort, or as an incident thereto, by any such nonresident or his, their, or its agent, servant or employee.

The Long Arm Statute permits the acquisition of in personam jurisdiction over a defendant upon any of three different theories: (1) the contract theory, (2) the tort theory, and (3) the doing business theory. Johnson alleges that this Court has personal jurisdiction of Warnaco under each of these theories. We proceed therefore, to discuss each.

## A. THE CONTRACT THEORY.

Johnson first contends that Warnaco made a contract with a resident of this state to be performed in whole or in part in this state, citing in support of its argument the Agreement of Merger dated July 21, 1969, between Gusco, Warnaco's subsidiary, and Gus Mayer I, relying particularly on the language found at Page 39 by which Warnaco "agrees to perform or cause to be performed all of the obligations and agreements of Warnaco, Inc. and Warnaco Subsidiary thereunder . . . ."

The simple answer to this contention is that the Agreement of Merger is not "a contract with a resident of this state". The parties to this Agreement were Gusco, Gus Mayer II, and Warnaco, the latter confirming and "guaranteeing" Gusco's obligations thereunder. None of these three parties is a Mississippi resident. Plaintiff's argument that he is within the statute as an alleged third party beneficiary of this contract emphasizes the fallacy of his position. To construe the statute as plaintiff would have the Court do requires the insertion of the words "for the benefit of", so

that the statute would apply to a nonresident "who shall make a contract *for the benefit of* a resident of this state." The Mississippi Long Arm Statute is remedial in nature and is to be construed liberally, but it is to be applied without enlargement of its provisions. *Mississippi Chemical Corp. v. Vulcan-Cincinnati, Inc.,* 224 F.Supp. 11 (S.D.Miss.1963), *aff'd* 338 F.2d 662 (5th Cir. 1964). The construction which plaintiff urges upon this Court would be an unwarranted modification or enlargement of its provisions.

## B. THE TORT THEORY.

Johnson contends that Warnaco committed a tort in whole or in part against a resident of this state because its sale of Gus Mayer II to DAC in 1974 constituted wilful interference with his business relationship with Gus Mayer II. In order for jurisdiction to be based upon such a single act, the cause of action must arise out of the act alleged. *Holvitz v. Norfleet-Ashley, Inc.,* 369 F.Supp. 394 (N.D.Miss.1973); *Mladinich v. Kohn,* 250 Miss. 138, 164 So.2d 785 (1964). It is well established in Mississippi that in order for a cause of action to exist for interference with a contract it must be proved that the contract in question would have been performed "but for" the wrongful interference of the defendant, and that the interference complained of was wrongful. Any interference is not wrongful and actionable if undertaken by someone in the exercise of a legitimate interest or right, which constitutes "privileged interference." *E. g., Martin v. Texaco, Inc.,* 304 F.Supp. 498 (S.D.Miss.1969); *Bailey v. Richards,* 236 Miss. 523, 111 So.2d 402 (1959). *See also, Southwest Drug Co. v. Howard Bros. Pharmacy, Inc.,* 320 So.2d 776 (Miss.1975). In its sale of Gus Mayer II to DAC, Warnaco was exercising its legitimate business interest and rights. Thus, this act was not tortious, and the tort theory provides no basis for this Court's exercise of in personam jurisdiction over Warnaco.

## C. THE DOING BUSINESS THEORY.

The evidence of record shows without contradiction that Warnaco has done no

business in Mississippi directly, inasmuch as it does no manufacturing in the state, owns no property herein, has no salesmen or other employees here, and has had none of the other contacts by which it could be found to be doing business directly in this state. Johnson contends, however, that Warnaco so controlled, directed, and in fact dominated the activities of its subsidiary, Gus Mayer II, that this Court should disregard the separate identities of these two corporations and "pierce the corporate veil" to find that Warnaco was doing business in this state through Gus Mayer II.

The principles of law which apply to the issue of "piercing the corporate veil" have long been recognized and are well established in the United States. As one court has stated:

It is elemental jurisprudence that a corporation is a creature of the law, endowed with a personality separate and distinct from that of the owners . . . . There does exist, however, a large class of cases in which the separateness of a corporate entity has been disregarded and a parent corporation held liable for the acts of its subsidiary because the subsidiary's affairs had been so controlled as to render it merely an instrument or agent of its parent. But the dual personality of parent and subsidiary is not lightly disregarded, since application of the instrumentality rule operates to defeat one of the principal purposes for which the law has created the corporation. Therefore, to justify judicial derogation of the separateness of a corporate creature, an aggrieved party must prove something more than a parent's mere ownership of a majority or even all of the capital stock and the parent's use of its power as an incident of its stock ownership to elect officers and directors of its subsidiary.

*Berger v. Columbia Broadcasting System, Inc.,* 453 F.2d 991, 994 (5th Cir.), *cert. denied,* 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) (applying New York law; citations omitted).

Another court has summarized the elements necessary to sustain application of the instrumentality rule referred to above as follows:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Lowendahl v. Baltimore & O. R. R.,* 247 App.Div. 144, 287 N.Y.S. 62, *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936), as quoted in *Berger v. Columbia Broadcasting System, Inc., supra* at 995.

The Fifth Circuit has emphasized that in order to pierce the corporate veil it must be shown that the subsidiary is " 'an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries.' Mere identity of corporate names, stockholders and officers of (sic) the fact of ownership of capital stock in one corporation by another are not sufficient to justify disregarding the corporate fiction." *Maule Industries, Inc. v. Gerstel,* 232 F.2d 294, 297 (5th Cir. 1956) (citations omitted).

It is clear that the above principles of law are not susceptible of precise formulation. Rather, "[t]he determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree." *Fish v. East,* 114 F.2d 177, 191 (10th Cir. 1940). In oft-quoted language the *Fish* court then proceeded to set forth certain factors which are to be considered in attempting to determine whether a subsidiary is an instrumentality:

(1) The parent corporation owns all or a majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Fish v. East, supra* at 191.

The issue of piercing the corporate veil has arisen repeatedly in American jurisprudence and it is now apparent that the instrumentality rule, as set forth above, is applied almost uniformly throughout the United States. *See, e. g., United States v. Dean Van Lines, Inc.,* 531 F.2d 289 (5th Cir. 1976); *Fidelity & Deposit Co. v. USAFORM Hail Pool, Inc.,* 523 F.2d 744 (5th Cir. 1975); *In re Beck Industries, Inc.,* 479 F.2d 410 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *Markow v. Alcock,* 356 F.2d 194 (5th Cir. 1966); *Garden City Co. v. Burden,* 186 F.2d 651 (10th Cir. 1951); *Coryell v. Phipps,* 128 F.2d 702 (5th Cir. .1942), *aff'd.* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Ltd.,* 210 F.Supp. 930 (D.Utah 1962), *aff'd,* 325 F.2d 713 (10th Cir. 1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1334, 12 L.Ed.2d 296 (1964).

At the time this case was tried there was no reported decision in which the Supreme Court of Mississippi had specifically recognized the principle of "piercing the corporate veil", although on several occasions other courts applying Mississippi law had concluded that the Mississippi court would do so in an appropriate case. *See, e. g., Houston Oil Field Material Co. v. Stuard,* 406 F.2d 1052 (5th Cir. 1969); *Hernando Bank v. Bryant Electric Co.,* 357 F.Supp. 575 (N.D.Miss.1973). However, in a case decided prior to trial of the instant case but reported thereafter, the Mississippi Supreme Court did in fact recognize and approve the "piercing" doctrine, but refused to pierce the veil based on the facts of that case. *Johnson & Higgins, Inc. v. Commissioner of Ins.,* 321 So.2d 281 (Miss.1975):

The general rule of law basic to the concept of the corporation is that the distinct corporate identity will be maintained unless to do so would subvert the ends of justice. . . .

The corporate entity is distinct although all or a majority of its stock be owned by a single individual or corporation or although the corporation is a so-called "family" or "closed" corporation. 18 Am.Jur.2d *Corporations* § 13 at 558–59 (1965). . . .

Ownership of all the stock of a corporation coupled with common management and direction does not, however, operate as a merger of the two corporations into a single entity . . . . One corporation may be disregarded where the two are identical or indistinguishable in fact. Unless it is a mere instrumentality or agency or adjunct in that sense, or as a sham or is used in fraud, by the dominant corporation it will not be disregarded; and it will not be disregarded unjustly. (1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 43 at 209 (Perm. Ed.1974)). . . .

Piercing the veil of a subsidiary in order to deal with its parent corporation should not be lightly undertaken:

[T]he mere fact that one owns all the stock of the other, or substantially all, is not enough to warrant disregard, in the absence of some fraudulent purpose; nor is the fact that there was an opportunity

to exercise control. Furthermore the fact that the shareholders of the two corporations are the same is not of itself sufficient to treat the two corporations as one. Fletcher, *supra*, § 43, at 210.

321 So.2d at 284–85.

In urging this court to apply the instrumentality rule Johnson first points to certain statements contained in Warnaco's annual reports: "Far from being run informally, Warnaco is highly computerized and centrally controlled . . . ." (Warnaco 1974 Annual Report p. 6.) "At the same time this autonomy on the firing line must be fitted into a system of overall control and optimum utilization of centralized corporate services." (Warnaco 1971 Annual Report p. 3.). He also points to the testimony of Jack Weiss, president of Gus Mayer II, who stated that he submitted "everything" to Warnaco for approval and signed all documents sent by Warnaco to him "like a good boy." This evidence lacks probative value and must be disregarded by the Court. "For purposes of application of the instrumentality rule, descriptive characterization is simply not an adequate alternative to a factual showing of the essential 'act of operation.'" *Berger v. Columbia Broadcasting System, Inc., supra* at 996.

What then are the factual matters upon which this Court must base its determination? It is true that certain facts developed at the trial of this case tend to show Warnaco's control of Gus Mayer II. Gus Mayer II was required to obtain financing through Warnaco; long range plans were required to be submitted to Warnaco for approval; employees' salaries above $25,000 were required to be approved by the parent; employee bonuses were similarly controlled; auditing procedures were prescribed by Warnaco; the Board of Directors of the two corporations were for the most part identical and the board meetings of the subsidiary were held at the corporate offices of Warnaco in Connecticut, and Weiss did not normally attend these meetings. But these facts without more fall far short of indicating the level of control and domination necessary for this Court to disregard the separate corporate identities of these two corporations.

To begin with, the formal legal requirements were scrupulously observed both in creating and conducting Gus Mayer II as a subsidiary of Warnaco. The actual legal mechanics followed in creating Gus Mayer II are commonplace in corporate reorganizations. Warnaco created a shell subsidiary, Gusco, Inc., into which the then existing Gus Mayer I was merged, and Gusco became the surviving corporation under the Merger Agreement changing its name to Gus Mayer Stores, Inc., the name of the old Gus Mayer company. In no case was Gus Mayer II represented to be anything other than a subsidiary of Warnaco.

Not only was Gus Mayer II properly and legally created as a subsidiary of Warnaco, but it also operated as a legally separate corporation from 1969 when the merger occurred until 1974 when it was sold. Having filed its certificate of incorporation in the state of Delaware, Gus Mayer II continued to remain in good standing in that state. It also became licensed to do business in every state in which it was doing business and remained in good standing therein. In each of those states, Gus Mayer II was recognized as a corporate entity legally distinct from its parent; and it maintained a board of directors, elected officers, maintained minutes of its board meetings and other corporate records, and generally did all those things a corporation normally does in carrying on a retail business in the corporate form.

We next note that Gus Mayer II was well financed separate and apart from any actions of Warnaco. Through the 1969 merger, Warnaco acquired a going concern in the old Gus Mayer company. Gus Mayer I had eighteen retail stores operating before the merger, and all were operating after the merger. These eighteen retail stores which made up Gus Mayer I were the creation of Jack Weiss' family, and Weiss himself had been actively involved in their development and operation from about 1940. It was an old and respected concern at the time of the

merger in 1969, trading in retail specialty items.

As a going concern, Gus Mayer I clearly had adequate borrowing capacity prior to the merger, and this fact did not change after the merger. Its assets never changed; it had approximately $12,000,000 both before and after the merger. Certainly the basic business structure of Gus Mayer I existed prior to the merger and remained basically the same thereafter, and creditors of Gus Mayer II looked to it, not to Warnaco, for payment.

Warnaco did centralize certain services which would benefit all of its subsidiaries, but the basic structure was never changed. Among the services performed by Warnaco for all of its subsidiaries was obtaining loans to finance operations. All of the subsidiaries including Gus Mayer II submitted budgets to the parent Warnaco and obtained financing individually as required, with the latter charging interest against all of the subsidiaries on inter-corporate books. While this method of financing the subsidiaries was in part dictated by insurance requirements, it would not in any case support a conclusion that all or any of Warnaco's subsidiaries were inadequately financed. *See,* Annot., 63 A.L.R.2d 1051, 1055 (1959).

Another of the *Fish* indicia which this court must examine is the payment of salaries and expenses. Gus Mayer II paid all of the salaries of its employees and all of its expenses, including the payment for corporate services rendered by Warnaco, which was accomplished by means of a "corporate charge" which was applied to all subsidiaries and maintained through inter-corporate accounts. This charge was 1.3% of sales for all subsidiaries except Gus Mayer II, for which the percentage was reduced to 1% as a result of the negotiation of Jack Weiss, president of Gus Mayer II.

Not included in this charge, but one of the services handled by the parent for its subsidiaries was the purchasing of insurance. Even here, however, this expense was borne by every subsidiary, including Gus Mayer, through inter-corporate accounts. In every sense of the word, therefore, Gus Mayer II paid its own way. Warnaco paid none of its expenses, and Jack Weiss' testimony was that Gus Mayer II paid for more than it received.

The evidence is also clear and uncontradicted that the board of directors of the subsidiary acted not in the independent and primary interests of the parent, but on the contrary, took no actions detrimental to the interests of Gus Mayer II. Weiss was of course a member of this board and had knowledge of every action taken by it. Although he failed to attend these board meetings, he stated that the transactions were "routine business" and he had no reason to attend, and accordingly signed waivers to all Gus Mayer II board meetings from his home in New Orleans rather than attend their meetings held in Bridgeport, Connecticut. In addition to being routine, the subject matter of these board meetings was "instituted by the management of Gus Mayer," and if the Board of Directors had taken any actions contrary to the interest of Gus Mayer II, Weiss professed that he would have "objected to them . . ., I can promise your that." In addition, it is clear that the nature of Warnaco's and Gus Mayer's businesses were in harmony, and there was therefore no reason for a conflict of interest to exist between the two boards of directors.

Likewise, there were no commingling of funds, interactivities or common direction and supervision which would lead to the conclusion that these two corporations are a single enterprise. The evidence elicited during cross-examination of Mr. Weiss revealed that Gus Mayer operated as a retail business enterprise separate from that of Warnaco and its other subsidiaries. Gus Mayer and Warnaco did not commingle funds; Gus Mayer was audited by internal auditors as well as a firm of public accountants and kept its own books and records and maintained its own balance sheets; and there was a strictly maintained record of accounts between the two corporations, with Warnaco charging all of its subsidi-

aries, including Gus Mayer, a corporate charge for its services.

The common direction and supervision between Warnaco and Gus Mayer was nothing more than parent and subsidiary often have. Warnaco had a group vice president who generally supervised and monitored the Gus Mayer activities, but the actual direction and control of the day to day, month to month, and year to year activities of Gus Mayer was exercised by Jack Weiss, who had represented to the plaintiff that he was "going up there as president . . . to still run everything. . . ." He did just this.

Beginning with the stores themselves, Weiss personally decided and negotiated for the locations of the new retail stores in Birmingham, Memphis, New Orleans and New Jersey while Gus Mayer was a Warnaco subsidiary, and employed attorneys of his choice to handle the required legal work. Each of these decisions involved $600,000 to $800,000 capital expenditure. In addition, Weiss personally initiated and negotiated for the sale of one of the Gus Mayer stores in Fresno and the renovation of the Beaumont store. He had his own managerial staff, all of whom he hired, including McClain of Finance, Rizoulis of Merchandising, Caldwell of Operations, and Sternberg as Comptroller. More importantly, however, this staff that came with Gus Mayer I in the 1969 merger all continued in their jobs thereafter, controlling the operation of Gus Mayer II.

This control extended to every basic facet of the business, including buying in the same manner as before the merger. The buyers, who were selected and employed by Gus Mayer II acted almost autonomously, deciding where and what to buy, what lines of merchandise to select, and were answerable only to Jack Weiss and the "bottom line".

Likewise, Warnaco imposed no changes in Gus Mayer II's other basic business practices, including the retention, hiring and supervision of local store managers by Gus Mayer II. These managers did not answer to Warnaco, but to the Gus Mayer II organization, which made all important decisions in their operations including the total level of inventory, its individual styles and the allocation thereof among the various stores.

Another facet of the retail business is finance. Gus Mayer II's budget was developed entirely by its management, and submitted to Warnaco as part of Gus Mayer II's "five year plan." A very small portion of this budget was allocated for the purchase of apparel from other Warnaco subsidiaries, but even this small portion was not forced upon Gus Mayer II by Warnaco and was in fact approximately the same before and after the merger.

Gus Mayer II entirely controlled and directed the display of its merchandise. Jack Weiss hired Val Danserau as its interior architect who had complete autonomy in the manner and methods of displaying merchandise to the public. Similarly, Gus Mayer II exercised complete control over the generation of sales and the credit policies extended to customers.

In short, in every facet of its retailing business Gus Mayer II was under the direction and control of Jack Weiss and his management and operated in much the same manner after the merger as it had before. In no case was the will of Warnaco imposed over that of Gus Mayer II in the manner and methods of this management.

The above facts amply demonstrate that Gus Mayer II, although a wholly owned subsidiary of Warnaco, was far from a mere instrumentality, agency, adjunct, or a sham. Under the general rule of law adopted by the Mississippi Supreme Court in *Johnson & Higgins, Inc. v. Commissioner of Ins., supra,* this Court may not and will not disregard the separate corporate identities of Warnaco and Gus Mayer II. Therefore, we decline to "pierce the corporate veil"; and thus conclude that Warnaco was not "doing business" in Mississippi by and through its subsidiary, Gus Mayer II.

CONCLUSION

For the foregoing reasons we conclude that Warnaco is not subject to service of

process under the Mississippi Long Arm Statute, Miss. Code Ann. § 13–3–57 (1972), because it has made no contract with a resident of Mississippi to be performed in whole or in part in this state; it has committed no tort in whole or in part in this state against a resident of this state; and it has done no business or performed any character of work or service in this state. This cause of action must therefore be dismissed at the cost of plaintiff for lack of in personam jurisdiction.

An Order of Dismissal, approved as to form by attorneys for both parties, shall be submitted to this Court within the time and in the manner prescribed by our local Rules.